NUMBER 13-09-00195-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

CORPUS CHRISTI
- EDINBURG

                                                                                                                     


 

CHARLES ANTHONY CUEVA II,                                          
     Appellant,

 

v.

 

THE STATE OF TEXAS,                                                Appellee.

                                                                                                                     
  

 

On appeal from the 347th District Court 

of Nueces County, Texas.

    
                                                                                                                     

 

OPINION

 

Before Justices Rodriguez, Benavides, and Vela

Opinion by Justice Rodriguez

                                                                                                            

Appellant Charles Anthony Cueva II challenges his conviction
for one count of indecency with a child and two counts of sexual assault of a
child.  See Tex. Penal Code Ann.
'
21.11(a) (West Supp. 2010),[1]
' 22.021(a)(1)(B) (West Supp. 2010). 
By four issues, Cueva argues that:  (1) the jury charge on one count of sexual
assault allowed for his conviction on a less than unanimous verdict; (2) the
punishment charge contained an erroneous instruction regarding the
applicability of good conduct time to his potential parole calculation; and
(3-4) he received ineffective assistance of counsel.  We affirm.

I.  Background

Indicted on eleven counts, Cueva pleaded not guilty to six
counts of aggravated sexual assault and one count of indecency with a child by
contact.  The State abandoned the remaining four counts before the trial
began.  A jury convicted Cueva of two counts of aggravated sexual assault and
assessed punishment at seventy years in prison and a $10,000 fine.[2] 
See Tex. Penal Code Ann. §
22.021(e) (identifying aggravated sexual assault as a first-degree felony), § 12.32 (West Supp. 2010) (providing
for first-degree felony punishment as imprisonment "for life or for any
term of not more than 99 years or less than 5 years" and "a fine not
to exceed $10,000").[3] 
It also convicted Cueva of the one count of indecency with a child and assessed
punishment at fifteen years and a $10,000 fine.  See id. ' 21.11(d) (setting out that indecency
with a child under subsection (a)(1) is a second-degree felony), § 12.33 (West
Supp. 2010) (allowing for second-degree felony punishment as imprisonment
"for any term of not more than 20 years or less than 2 years" and
"a fine not to exceed $10,000").  The trial court ordered the
sentences to run concurrently.  Cueva filed a motion for new trial raising, among
other issues, ineffective assistance of counsel claims.  After hearing Cueva's
motion for new trial, the trial court denied the motion and later issued
extensive findings.  This appeal followed.

II.  Jury Charge Issues

In his first two issues, Cueva complains of charge error.  By
his first issue, Cueva argues that the guilt-innocence jury charge allowed for
his conviction for aggravated sexual assault on a less than unanimous verdict. 
By his second issue, Cueva argues that the jury charge at the punishment stage
contained an erroneous instruction regarding the applicability of good conduct
time to his potential parole calculation.

A.  Standard
of Review








In analyzing a jury charge issue, our initial inquiry is
whether error exists in the charge submitted to the jury.  Ngo v. State,
175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc).  If error is found, the degree
of harm necessary for reversal depends on whether the appellant preserved the
error by objection.  Id.  If the defendant properly objected to the
erroneous jury charge, reversal is required if we find "some harm" to
the defendant's rights.  Id.  Here, Cueva concedes that he did not
object at trial to either jury charge issue he raises on appeal, so we may only
reverse if the record shows egregious harm.  See id. at 743‑44.

Egregious harm is a difficult standard that is determined on
a case-by-case basis.  Ellison v. State, 86 S.W.3d 226, 227 (Tex. Crim.
App. 2002) (en banc); Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim.
App. 1996) (en banc); see Igo v. State, 210 S.W.3d 645, 647 (Tex.
Crim. App. 2006) (applying egregious harm analysis to erroneous parole and good
conduct instructions).  To determine whether a defendant suffered egregious
harm, we assess the degree of harm in light of (1) the entire jury charge, (2)
the state of the evidence, including contested issues, (3) the arguments of
counsel, and (4) any other relevant information in the record.  Warner v.
State, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008); see Almanza v. State,
686 S.W.2d 157, 172 (Tex. Crim. App. 1985) (op. on reh'g).  Errors that result
in egregious harm are those that affect "the very basis of the case,"
"deprive the defendant of a valuable right," or "vitally affect
a defensive theory."  Ngo, 175 S.W.3d at 750; Hutch, 922
S.W.2d at 171 (citing Almanza, 686 S.W.2d at 172).

 

B.  Unanimity
of the Verdict on Count 4

1.  Applicable Law

The Texas Constitution requires a unanimous verdict in felony
criminal cases.  Tex. Const. art.
V, ' 13; see Tex. Code Crim. Proc. Ann. art.
36.29(a) (West Supp. 2010).  A unanimous verdict is more than a mere agreement
on a violation of a statute; it ensures that the jury agrees on the factual
elements underlying an offense.  Francis v. State, 36 S.W.3d 121, 125
(Tex. Crim. App. 2000) (op. on reh'g) (en banc).  Generally, instructing a jury
on alternative theories of committing the same offense does not violate the
unanimity requirement.  Martinez v. State, 129 S.W.3d 101, 103 (Tex.
Crim. App. 2004).  If a defendant is charged with multiple offenses, however,
the trial court must instruct the jury that it cannot return a guilty verdict
unless it unanimously agrees upon which offense the defendant committed.  Gonzalez
Soto v. State, 267 S.W.3d 327, 335 (Tex. App.—Corpus
Christi 2008, no pet.) (citing Ngo, 175 S.W.3d at 744).








We determine exactly what a jury must be unanimous about by
examining the legislative intent of the applicable statute.  Id.
(citations omitted).  The statute at issue here is section 22.021 of the penal
code, which provides, in relevant part, that a defendant commits an offense if
he intentionally or knowingly:

(i)         causes the penetration of the anus or
sexual organ of a child by any means; 

 

(ii)       causes the penetration of the mouth of a
child by the sexual organ of the actor; 

 

(iii)      causes the sexual organ of a child to
contact or penetrate the mouth, anus, or sexual organ of another person,
including the actor; 

 

(iv)      causes the anus of a child to contact the
mouth, anus, or sexual organ of another person, including the actor; or 

 

(v)       causes the mouth of a child to contact the
anus or sexual organ of another person, including the actor; and

 

the victim is younger than fourteen
years of age.  Tex. Penal Code Ann.
' 22.021(a)(1)(B), (2)(B).  The Texas
Court of Criminal Appeals has ruled that section 22.021 is a conduct-oriented
offense in which the Legislature criminalized specific acts of conduct of
several different types.  Vick v. State, 991 S.W.2d 830, 832 (Tex. Crim.
App. 1999).  In other words, each of the above separately-described acts
constitutes a separate statutory offense.  Id. at 833.  For example, an
allegation that a defendant caused a child's sexual organ to contact his mouth
is a separate and distinct offense from an allegation that the defendant
penetrated the child's sexual organ with his sexual organ.  See id.  Likewise,
touching a child's breast and touching a child's genitals are separate
offenses.  See Francis, 36 S.W.3d at 124.








For our purposes, however, there is one notable exception to Vick's
general rule—the exception for subsumed conduct.  See Patterson v. State,
152 S.W.3d 88, 92 (Tex. Crim. App. 2004) (en banc); Valdez v. State, 211
S.W.3d 395, 400 (Tex. App.—Eastland 2006, no pet.); Hendrix
v. State, 150 S.W.3d 839, 848 (Tex. App.—Houston
[14th Dist.] 2004, pet. ref'd).  It is true that section 22.021 identifies
different types of conduct that constitute separate offenses, even if the
different acts occur in the same transaction.  Valdez, 211 S.W.3d at
400; see Tyson v. State, 172 S.W.3d 172, 178 (Tex. App.—Fort Worth 2005, pet. ref'd).  There are some cases,
though, in which one of the acts would necessarily be subsumed by another, such
as contact and penetration.  Valdez, 211 S.W.3d at 400; see Gonzalez
Soto, 267 S.W.3d at 339.  In that event, what would appear under the charge
to be two acts—contact and penetration—is, essentially, one act for purposes of
determining unanimity, and as such, the defendant's right to unanimity in his
verdict is not violated because every juror who believed that the defendant
penetrated the alleged victim "necessarily believed that the antecedent
contact had occurred."  Valdez, 211 S.W.3d at 400; see Hendrix,
150 S.W.3d at 848; see also Patterson, 152 S.W.3d at 92 (holding that
penile contact with the alleged victim's mouth, genitals, or anus in the course
of penile penetration is subsumed within the penetration offense).

2.  Discussion








In his first issue, Cueva argues that the jury charge on
Count 4 was erroneous because the jury could have found him guilty of
aggravated sexual assault without unanimously agreeing that Cueva either
contacted or penetrated A.G.'s anus.  We disagree.

In Count 4, the jury was charged as follows:

Now if
you find from the evidence beyond a reasonable doubt that [Cueva], on or about August
5, 2007, in Nueces County, Texas, did then and there intentionally or knowingly
cause his sexual organ to contact or penetrate the anus of [A.G.], and that
[A.G] was then younger than 14 years of age and not the spouse of [Cueva], then
you will find [Cueva] guilty of Count 4:  Aggravated Sexual Assault Of A Child.

 

Unless
you so find from the evidence beyond a reasonable doubt, or if you have a
reasonable doubt thereof, you will find [Cueva] not guilty of Count 4: 
Aggravated Sexual Assault Of A Child.

 

The allegation that Cueva caused his sexual organ to contact
A.G.'s anus is subsumed within the allegation that he penetrated A.G.'s anus
with his sexual organ.  Every juror who believed that Cueva penetrated A.G.'s
anus necessarily believed that he contacted it.  Unlike the cases in which the
alleged conduct was contact or penetration of separate body parts, here, Cueva
could only be convicted under Count 4 if the jury determined that he assaulted
A.G.'s anus.  In other words, the jury could not divide over whether Cueva
assaulted one body part or another but, rather, necessarily had to agree that
Cueva contacted or penetrated A.G.'s anus to return a guilty verdict.

Cueva argues that because A.G. testified to multiple
instances of contact and penetration, the penetration-subsumes-contact
exception does not apply to the facts of this case.  In support of his
argument, Cueva cites the following three cases:  Gonzalez Soto, 267
S.W.3d at 339; Martinez v. State, 212 S.W.3d 411, 419-20 (Tex. App.—Austin 2006, pet. ref'd); and Stewart v. State, No.
14-08-00625-CR, 2009 Tex. App. LEXIS 2085, at *7 (Tex. App.—Houston
[14th Dist.] May 5, 2009, no pet.) (mem. op., not designated for publication). 
These cases are, however, distinguishable from the present case.








In Gonzalez Soto, the jury charge contained one count
of aggravated sexual assault of a child and instructed the jury to convict
Gonzalez Soto of the offense if he "intentionally or knowingly . . .
cause[d] his sexual organ to contact the mouth" of the complainant or
"intentionally or knowingly cause[d] his sexual organ to penetrate the
mouth" of the complainant or "intentionally or knowingly cause[d] his
finger to penetrate the sexual organ" of the complainant.  267 S.W.3d at
336.  At trial, the complainant "testified that there were two separate
incidents in which appellant caused his penis to penetrate her mouthCone in her mother's bedroom and a
second incident in her bedroom."  Id. at 339.

In Martinez, the jury charge, again, contained only
one count of aggravated sexual assault of a child and instructed the jury to
convict Martinez of the offense if he "knowingly and intentionally . . .
cause[d] the penetration of the anus of [the complainant] . . . , cause[d] the
anus of [the complainant] . . . to contact the sexual organ" of Martinez. 
212 S.W.3d at 415.  The aggravated sexual assault count did not include the
word "and" or "or" in between the "penetration"
phrase and "contact" phrase.  Id.  At trial, the complainant
"testified that the abuse happened on more than one occasion."  Id.
at 414.

In Stewart, the jury charge also contained one count
of aggravated sexual assault of a child and allowed conviction for the offense
if "on or about the 2nd day of January, 2005," the appellant
"intentionally or knowingly cause[d] the contact or penetration of the
anus or female sexual organ of [the complainant] . . . by [Stewart]'s sexual
organ . . . ."  2009 Tex. App. LEXIS 2085, at *8-9.  At trial, the
complainant testified that the defendant "touched his private parts to her
private parts on three occasions in January 2005."  Id. at *2.








Here, the jury was instructed in seven separate counts
regarding different alleged offenses on different dates.  The only detailed
testimony offered by A.G. concerning contact or penetration of her anus was the
incident on August 5, 2007, in which A.G.'s mother walked in on Cueva in a
compromising position with A.G.  We acknowledge that A.G. testified that Cueva
touched her with his "private" on her "front" and
"back" "more than one time."  A.G.'s mother also testified
that A.G. told her "it had happened more than once.  She did not specify
exactly when.  She just said whenever I would shower or leave."  Carol
McLaughlin, the Sexual Assault Nurse Examiner (S.A.N.E.), testified similarly,
stating that A.G. told her that Cueva "does this every time when my mom
leaves."  

However, unlike Gonzalez Soto, Martinez and Stewart,
in which the complainants testified clearly about multiple incidents yet the
jury charges contained only one count of aggravated sexual assault, the jury at
Cueva's trial was charged with multiple counts of aggravated sexual assault on
multiple dates and A.G.'s vague recollections that Cueva had touched her on
more than one occasion did not create a danger that the jury would confuse the
specific testimony regarding the incident on August 5, 2007Cthe incident charged in Count 4Cwith the unspecified instances A.G.
alluded to in her comment that Cueva had touched her "more than one
time."  Gonzalez Soto, Martinez, and Stewart  are,
therefore, inapplicable to the facts of this case, and we are not persuaded by
Cueva's argument that the penetration-subsumes-contact exception does not apply
to Count 4.

Based on the foregoing, we conclude that no error existed
that violated Cueva’s right to unanimity in his verdict in Count 4 of the jury
charge.  See Ngo, 175 S.W.3d at 743-44.  Having found no error, we need
not address harm.  See id. at 743.  Cueva's first issue is overruled.

C.  Good
conduct Time and Parole Charge Instruction

By his second issue, Cueva contends, and the State agrees,
that the trial court's punishment charge improperly instructed the jury that
good conduct time would be added to actual time served to determine when Cueva
would be eligible for parole.  Given that Cueva did not object to this portion
of the punishment charge, the question for this Court is whether Cueva was
egregiously harmed by this error.  See id. at 743-44.

1.  Applicable Law








For certain offenses, including those for which Cueva was
convicted, article 37.07, section 4(a) of the code of criminal procedure
requires that the following parole law instruction be included in the
punishment charge:

 

Under
the law applicable in this case, the defendant, if sentenced to a term of
imprisonment, may earn time off the period of incarceration imposed through the
award of good conduct time.  Prison authorities may award good conduct time to
a prisoner who exhibits good behavior, diligence in carrying out prison work assignments,
and attempts at rehabilitation.  If a prisoner engages in misconduct, prison
authorities may also take away all or part of any good conduct time earned by
the prisoner.

 

It is
also possible that the length of time for which the defendant will be
imprisoned might be reduced by the award of parole.

 

Under
the law applicable in this case, if the defendant is sentenced to a term of
imprisonment, he will not become eligible for parole until the actual time
served equals one‑half of the sentence imposed or 30 years, whichever is
less, without consideration of any good conduct time he may earn.  If
the defendant is sentenced to a term of less than four years, he must serve at
least two years before he is eligible for parole.  Eligibility for parole does
not guarantee that parole will be granted.

 

It
cannot accurately be predicted how the parole law and good conduct time might
be applied to this defendant if he is sentenced to a term of imprisonment,
because the application of these laws will depend on decisions made by prison
and parole authorities.

 

You may
consider the existence of the parole law and good conduct time.  However, you
are not to consider the extent to which good conduct time may be awarded to or
forfeited by this particular defendant.  You are not to consider the manner in
which the parole law may be applied to this particular defendant.

 

Tex. Code.
Crim. Proc. Ann. art.
37.07, ' 4(a) (West Supp. 2010) (emphasis
added); see id. at art. 42.12, ' 3g(a)(1) (West Supp. 2010).

2.  Discussion

While the mandatory parole instruction was given in the
punishment jury charge, the trial court erred when it included the following
italicized language in the third paragraph of its parole instruction:

Under
the law applicable in this case, if the defendant is sentenced to a term of
imprisonment he will not become eligible for parole until the actual time
served plus any good conduct time earned equals one-half of the sentence
imposed or 30 years, whichever is less.  Eligibility for parole does not
guarantee that parole will be granted.

 

(Emphasis added.)  Cueva argues that,
by this error, the trial court essentially instructed the jury that he would
become eligible for parole much earlier than he actually would be under the
correct law.  Cueva asserts that the jury responded to this erroneous
instruction by imposing extremely lengthy sentences that were "especially
harsh"—seventy years for each count of aggravated sexual assault and
fifteen years for indecency with a child.  He argues that "[t]he trial
court's gross misstatement of the law misled the jury and adversely affected
how it viewed parole and good conduct time, which the charge plainly authorized
the jury to consider."  Cueva contends that "the erroneous parole
instruction affected the very basis of the sentences and caused egregious
harm."  We disagree.

The court of criminal appeals has refused to find that a
similar error of this nature was egregious error.  See Igo, 210 S.W.3d
at 647.  In Igo, the punishment charge informed the jury that Igo
"would not become eligible for parole until the actual time served, plus
good time, equaled one-fourth of the sentence imposed," when it should
have been instructed that Igo "would not become eligible for parole until
the actual time served, without considering good time, equaled one-half
of the sentence imposed."  Id. at 646.  Concluding that the error
resulted in no egregious harm, the Igo Court reasoned as follows:

Although appellant did receive the maximum sentence, a
number of other factors mitigate against a finding of egregious harm.  First,
the parole instruction contained the standard curative language admonishing the
jury not to consider the extent to which the parole law might be applied to the
defendant.  Second, parole was not mentioned by either counsel during argument
on punishment.  And finally, the evidence relating to punishment was
exceptionally strong.

 

Id. at 647; see Ross v. State, 133 S.W.3d 618,
623 (Tex. Crim. App. 2004) (finding a similar error to be harmless, so long as
there was no reasonable probability that the jury was misled into believing
that if the defendant received a life sentence he might become eligible for
parole in less than forty years through the award of good conduct time or that
he was certain to be released after he became eligible for parole); Stewart
v. State, 293 S.W.3d 853, 855-62 (Tex. App.—Texarkana
2009, pet. ref'd) (being guided by the analysis provided in Igo, the
Texarkana Court concluded that a substantially similar punishment charge error
was not egregious); Warner, 245 S.W.3d at 461 (explaining that egregious
harm is assessed in light of the entire jury charge, the state of the evidence,
the arguments of counsel, and any other relevant information in the record).

In this case, Cueva was sentenced to a substantial, but not
the maximum, sentence on the two counts of aggravated sexual assault.  See
Tex. Penal Code Ann. §§ 12.31,
22.021(e).  The seventy-year sentences were to run concurrently with the
fifteen-year sentence assessed for his indecency-with-a-child conviction. 
Moreover, the instruction in question effectively told the jury that its
sentence would have an effect on when Cueva became eligible for parole if that
sentence was sixty years or less, but that, for sentences over sixty years, a
thirty-year term would automatically apply.  Because the two significantly
longer sentences in this case were for seventy years each, they were outside
the range within which this section applied.  Therefore, there was no
parole-based incentive to lengthen the sentences beyond sixty years, and it is
reasonable to conclude that the jury chose seventy-year sentences for other
reasons.

In addition, the jury charge contained the standard curative
instruction which consisted of a total of five paragraphs, only one of which contained
an error.  See Igo, 210 S.W.3d at 647.  While the charge erroneously
instructed the jury concerning when Cueva might become eligible to be
considered for parole, it did inform the jurors, in accordance with the
statute, that they were not to consider the manner in which the parole law may
be applied to Cueva.  Assuming the jury followed this instruction, see
Gamboa v. State, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009), we conclude,
as did the Beaumont Court in Stewart v. State, that "[t]his
factor, alone, does not dictate a finding of egregious harm."  293 S.W.3d
at 857; see Igo, 210 S.W.3d at 647.

Furthermore, neither parole nor good conduct time was
mentioned during punishment arguments.  This suggests that the issue of the
parole law was not central to the punishment stage of the case.  See Igo,
210 S.W.3d at 647; Stewart, 293 S.W.3d at 859.

Finally, we assess harm based, in part, on the state of the
evidence.  See Warner, 245 S.W.3d at 461; Stewart, 293 S.W.3d at
857.  The State's punishment evidence set out a number of undesirable changes
noted in A.G.'s behavior following Cueva's actions.  The evidence also
highlighted conditions for probation and the unlikelihood that Cueva, who was
described as an opportunistic and impulsive person, would successfully complete
any probation period.  And Cueva had been found guilty of repeatedly sexually
assaulting and fondling A.G., a five-year-old girl, who was in the vulnerable
position of becoming his step-daughter.  The above evidence, as well as the
"visceral nature of the offense itself[,] offer sufficient support to
explain the jury's assessment of punishment without suggesting harm from the
charge."  Stewart, 293 S.W.3d at 858.

Under the stringent standards necessary to show egregious
harm, see Ellison, 86 S.W.3d at 227; Hutch, 922
S.W.2d at 171, we conclude that this error did not affect the very basis of his
sentences, as urged by Cueva.  See Ngo, 175 S.W.3d at 750; Hutch,
922 S.W.2d at 171.  Egregious harm has not been shown.  Cueva's second issue is
overruled.

III.  Ineffective Assistance of Counsel

By his third issue, Cueva complains
that he received ineffective assistance of counsel during the guilt-innocence
stage and, by his fourth issue, that he received ineffective assistance during
the punishment stage.  By more than twenty-five sub-issues, Cueva asserts that he was denied
effective assistance of counsel for failing to investigate, failing to admit
evidence, eliciting or failing to object to testimony, failing to object to
arguments made by the prosecutor, making improper jury arguments, and failing
to object to the jury charges.

The trial court imposed sentence
against Cueva on March 12, 2009 and signed the judgment of conviction on March
25, 2009.  Cueva timely filed a motion for new trial on April 13, 2009,
bringing a number of ineffective-assistance-of-counsel claims.  See Tex. R. App. P. 21.8 (explaining that a
defendant may file a motion for new trial no later than 30 days after the date
the trial court imposes or suspends sentence in open court).  Cueva's motion
was heard on May 14, 15, and 21, 2009, at which time Cueva's trial counsel testified and
the trial court admitted, as exhibits, the psychological evaluation, curriculum
vitae, and supplemental affidavit of defense expert, Paul Hamilton, Ph.D., and
the psychiatric evaluation of the State's expert, Joel Kutnick, M.D.[4]  Cueva asserted, over the State's objection, additional
complaints of ineffective assistance for the first time at the hearing.  The
trial court denied the motion for new trial by written order on May 26, 2009,
the seventy-fifth day after Cueva's sentence was imposed in open court.  See
id. ("The court must rule on a motion for new trial within 75
days after imposing or suspending sentence in open court.").  Seven days
later, on June 1, 2009, Cueva requested findings of fact.  Cueva appealed from
the judgment.  On appeal, Cueva included complaints of ineffective assistance
of counsel made for the first time on appeal.

On July 1, 2009, the trial court
signed and filed its findings.  The trial court summarized its findings as follows
in finding of fact 4 (guilt-innocence stage) and finding of fact 44 (punishment
stage):

The Court finds that, with regard to
each of the claims individually, and as a whole, Cueva has failed to prove by a
preponderance of the evidence either that [counsel's] performance was deficient
or outside the range of competence demanded of attorneys in criminal cases, or
that it is reasonably probable that the alleged deficiencies, individually or
together, prejudiced his defense to the extent that, but for the supposed
deficiencies, Cueva would not have been found guilty at trial or the result of
the proceeding would have been different.

The trial court
filed sixty-one additional findings of fact, specific as to Cueva's
ineffective-assistance-of-counsel claims.

A.  Trial
Court's Findings

 

As a threshold issue, the State
asserts that we should not consider the trial court's findings because the
trial court did not make its findings when it ruled on Cueva's motion for new
trial.[5]  The trial court
imposed sentence against Cueva in open court on March 12, 2009 and denied
Cueva's motion for new trial seventy-five days later, on May 26, 2009.  The
trial court's findings were filed on July 1, 2009, more than one month after it
ruled on the motion and more than 100 days after sentence was imposed.  The
State asserts that discretionary rule of appellate procedure 21
"ties" the trial court's findings to its ruling on the motion, and,
therefore, those findings, like the ruling, must have been made within
seventy-five days after the trial court imposed Cueva’s sentence.  See Tex. R. App. P. 21.8(a)-(b).  We
disagree.

Texas Rule of Appellate Procedure 21
provides, in relevant part, the following trial court process for ruling on a
motion for a new trial and for making findings of fact:

(a)       Time to rule.  The court must rule on a motion
for new trial within 75 days after imposing or suspending sentence in open
court.

 

(b)       Ruling.  In ruling on a motion for new trial, the
court may make oral or written findings of fact.…

 

Id.  The earlier
version of rule 21.8(b) set out that "[i]n ruling on a motion for new
trial, the court must not summarize, discuss, or comment on evidence."  Landers
v. State, 256 S.W.3d 295, 301 n.4 (Tex. Crim. App. 2008).  Now, "the
court may make oral or written findings of fact."  Tex. R. App. P. 21.8(b).

"The rationale for the change in
the rule is to ensure that appellate courts will not need to speculate as to
the possible factual findings supporting a trial judge's ruling if the trial
judge will articulate them."  Landers, 256 S.W.3d at 301 n.4
(citing State v. Cullen, 195 S.W.3d 696, 698 (Tex. Crim. App. 2006)
(noting that a trial court's refusal to enter findings of fact "leaves
appellate courts with nothing to review except a one-word ruling and forces the
courts of appeals to make assumptions about the trial court's ruling"
where "[t]he ruling could be based on a mistake of law, on the trial
court's disbelief of the testimony presented, or even on a clerical
error")); see In re Gillespie, 124 S.W.3d 699, 703 (Tex. App.—Houston
[14th Dist.] 2003, no pet.) (explaining, in a civil context, that the
expiration of the trial court's plenary power does not affect or diminish the
trial court's ability to make and file amended findings of fact).  Unlike the Texas Rules of Civil Procedure, appellate rule 21.8
provides no time frame for requesting or filing findings or amended findings.  Compare
Tex. R. App. P. 21.8, with Tex. R. Civ. P. 296 (providing that
appellant shall file his request for findings within twenty days after the
judgment is signed) and id. at R. 297 (setting out, among other
things, that the court shall file its findings within twenty days after a timely
request is filed), and id. at R. 298 (providing
"[a]fter the court files original findings of fact …, any party may file
with the clerk of the court a request for specified additional or amended
findings … within ten days after the filing of the original findings … by the
court").

Guided by this rationale, we conclude
that rule 21 does not require the trial court to make its findings within the
same seventy-five-day period it has to rule on the motion for new trial, and we
will, therefore, consider all relevant trial court findings.  See Tex. R. App. P. 21.8(a)-(b).  We do so
in an effort to ensure that we will not need to speculate as to the possible
factual findings supporting the trial court's ruling.  See Landers, 256
S.W.3d at 301 n.4.  Furthermore, even were we to conclude that the trial court
made its extensive and explicit written findings in error because the findings
were issued after the expiration of the time period within which it was required
to rule on the motion, the findings are, at worst, harmless.  A reviewing court
must defer to any plausible, implied factual findings that are reasonable and
supported by the record and that would uphold the trial court's ruling.[6]  See Johnson
v. State, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005).  As
discussed in detail below, the trial court's factual findings, in this case,
are those which we would imply as necessary to support the ruling and to which
we would defer because they are both reasonable and supported in the record.  See
id.

The State also suggests that we
should not consider the trial court's findings because certain specific deficiency
findings are inconsistent with the trial court's general finding that
"Cueva has failed to prove by a preponderance of the evidence … that
[counsel's] performance was deficient or outside the range of competence
demanded of attorneys in criminal cases."  However, when this general
finding is read in its entirety, we find no such inconsistency

Finding of fact 4 set out, generally,
that Cueva failed to prove that counsel's performance was deficient or
that a deficiency, if any, prejudiced his defense.  Likewise, after each
specific finding of deficiency, the trial court found that the deficiency, if
any, did not prejudice Cueva's defense.  For example, by its specific finding
31, the trial court found that counsel's "failure to ask for an
instruction to disregard or a mistrial regarding improper testimony by [A.G.'s]
mother about an extraneous assault fell below an objective standard of
reasonableness under the prevailing professional norms."  In finding 32,
the trial court then found that "any deficient performance did not cause
prejudice."  Therefore, the State's argument is not persuasive.  As
concluded above, all specific findings support the general language of finding
4, and we will consider all relevant trial court findings.

B.  Standards of Review and Applicable Law

1.  Claims Raised in Motion for New Trial

 

Appellate issues involving claims brought in a motion for new
trial are really challenges to the trial court's ruling on the motion.  See
Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), superseded
in part by rule of appellate procedure 21.8(b) on other grounds, as
recognized by State v. Herndon, 215 S.W.3d 901, 905 n.5 (Tex. Crim.
App. 2007); Shanklin v. State, 190 S.W.3d 154, 158 (Tex. App.—Houston [1st Dist.] 2005), pet. dism'd, 211 S.W.3d 315
(Tex. Crim. App. 2007); see also Delgado v. State,
13-09-00300-CR, 2010 Tex. App. LEXIS 6730, at *4-5 (Tex. App.—Corpus Christi
Aug. 19, 2010, no pet.) (mem. op., not designated for publication).  We review
a denial of a motion for new trial under an abuse of discretion standard.  Charles,
146 S.W.3d at 208; see Shanklin, 190 S.W.3d at 158; see also Delgado,
2010 Tex. App. LEXIS 6730, at *4-5.  A trial court abuses its discretion
by denying a motion for new trial only when its decision is arbitrary or
unreasonable—that is, when no reasonable view of the record could support the
trial court's ruling.  Charles, 146 S.W.3d at 208; see Escobar v. State, 227 S.W.3d 123,
126 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).  Under the facts
of this case, we will, therefore, review the two prongs of Strickland v.
Washington, set out below, through this abuse of discretion standard of
review, reversing only if the trial court's decision, as to the claims raised
in Cueva's motion, is arbitrary or unreasonable.  Charles,
146 S.W.3d at 208; My Thi Tieu v. State, 299 S.W.3d 216, 223 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd); Shanklin,
190 S.W.3d at 158-59; see Strickland, 466 U.S. 668, 87 (1984); State v. Gill, 967 S.W.2d 540, 542 (Tex. App.—Austin 1998,
pet. ref'd) (holding that when a trial court grants a motion for new trial on
the basis of ineffective assistance of counsel, an appellate court should
review the standards of Strickland through a prism of the abuse of discretion
standard and decide whether the trial court's decision to grant a new trial was
so outside the zone of reasonable disagreement that it is subject to reversal).

Moreover, when the trial court files findings, as in this
case, "[a]n appellate court should defer to the trial
court's findings of facts regarding the credibility and demeanor of the
witnesses, viewing the evidence in the light most favorable to the trial
judge's rulings."  Gamboa, 296 S.W.3d at 584; see My Thi
Tieu, 299 S.W.3d at 223; Shanklin, 190 S.W.3d at 158‑59; see
also Tex. R. App. P. 21.8. 
Because the trial judge is the sole judge of the credibility of the witnesses,
a trial court does not abuse its discretion by denying a motion for new trial
based on conflicting evidence.  See Lewis v. State, 911 S.W.2d 1, 7
(Tex. Crim. App. 1995).  And we "presume that all
reasonable factual findings that could have been made against the losing party
were made against that losing party."  Charles, 146 S.W.3d at 208
(citing Quinn v. State, 958 S.W.2d 395, 402 (Tex. Crim. App. 1997); Beck
v. State, 573 S.W.2d 786, 791 (Tex. Crim. App. 1978) (noting that, at a
motion for new trial hearing, the trial judge has "the right to accept or
reject any part of" a witness's testimony)).

We utilize a two prong Strickland
analysis to determine whether counsel's representation was so deficient that it
violated a defendant's constitutional right to effective assistance of
counsel.  See Strickland, 466 U.S. at 687.  Appellant must show by a
preponderance of the evidence that (1) counsel's performance was deficient, and
(2) the deficiency prejudiced the defense.  Perez v. State, 310 S.W.3d
890, 893 (Tex. Crim. App. 2010); Goodspeed v. State, 187 S.W.3d 390, 392
(Tex. Crim. App. 2005); Jaynes v. State, 216 S.W.3d 839, 851 (Tex. App.—Corpus
Christi 2006, no pet.); see Strickland, 466 U.S. at 687; Ex parte
Martinez, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006).  A defendant's
failure to satisfy one prong negates the court's need to consider the other
prong.  Strickland, 466 U.S. at 697; Williams v. State, 301
S.W.3d 675, 687 (Tex. Crim. App. 2009), cert. denied, 130 S. Ct. 3411 (2010).

Counsel's performance is deficient
when his representation falls below an objective standard of reasonableness.  Ex
parte Briggs, 187 S.W.3d 458, 466 (Tex. Crim. App. 2005); Strickland,
466 U.S. at 687-88.  In determining whether there is a deficiency, we afford
great deference to trial counsel's ability, indulging “a strong presumption
that counsel's conduct falls within the wide range of reasonable professional
assistance,” Strickland, 466 U.S. at 689, and that counsel's actions
were the result of sound and reasonable trial strategy.  Jaynes, 216
S.W.3d at 851.  Decisions rooted in strategy do not constitute deficient
performance.  Strickland, 466 U.S. at 689.  Unless a defendant can show
in the record that counsel's conduct was not the product of a strategic
decision, "a reviewing court should presume that trial counsel's
performance was constitutionally adequate 'unless the challenged conduct was so
outrageous that no competent attorney would have engaged in it.'"  State
v. Morales, 253 S.W.3d 686, 696-97 (Tex. Crim. App. 2008) (en banc)
(quoting Goodspeed, 187 S.W.3d at 392); Roberts v. State, 220
S.W.3d 521, 533 (Tex. Crim. App. 2007) (quoting Goodspeed, 187 S.W.3d at
392); cf. Andrew v. State, 159 S.W.3d 98, 102 (Tex. Crim. App.
2005) (“[W]hen no reasonable trial strategy could justify the trial counsel’s
conduct, counsel’s performance falls below an objective standard of
reasonableness as a matter of law, regardless of whether the record adequately
reflects the trial counsel’s subjective reasons for acting as she did.”).

A defendant must also show that
counsel's deficiency caused prejudice—i.e., that the "errors were so
serious as to deprive the defendant of a fair trial, a trial whose result is
reliable."  Strickland, 466 U.S. at 687.  To show prejudice, the
defendant "must show there is a reasonable probability that, but for his
counsel's unprofessional errors, the result of the proceeding would have been
different."  Smith v. State, 286 S.W.3d 333, 340 (Tex. Crim. App.
2009) (citing Strickland, 466 U.S. at 694).  A reasonable probability of
prejudice is a "probability sufficient to undermine confidence in the
outcome," meaning "counsel's errors were so serious as to deprive the
defendant of a fair trial, a trial whose result is reliable."  Id.
(citing Strickland, 466 U.S. at 687); Mallett v. State, 65 S.W.3d
59, 62 (Tex. Crim. App. 2001) (explaining that a lawyer's deficient performance
must undercut the "proper functioning of the adversarial process"
such that the result of the trial cannot be reliable).  "While the
ultimate question of prejudice under Strickland is to be reviewed de novo, the
trial court should be afforded deference on any underlying historical fact
determinations."  Escobar, 227 S.W.3d at 127 (quoting Johnson,
169 S.W.3d at 239).

"This right [to effective
assistance of counsel] does not mean errorless or perfect counsel whose
competency of representation is to be judged by hindsight."  Robertson
v. State, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).  "The 'right to
effective assistance of counsel merely ensures the right to reasonably
effective assistance.'"  Id. (quoting Rylander v. State, 101
S.W.3d 107, 109-10 (Tex. Crim. App. 2003) (en banc)).  "Allegations of ineffectiveness of
counsel must be firmly founded in the record,"  Escobar, 227 S.W.3d
at 127 (citing Mallett, 65 S.W.3d at 63), and a silent record that
provides no explanation for counsel's actions typically will not overcome the
strong presumption of effective assistance.  Rylander, 101 S.W.3d at
110-11; Shanklin, 190 S.W.3d at 158-59.

2.  Other Claims

There are significant differences
between the claims Cueva raised in his timely-filed motion for new trial and
the claims Cueva argued at the hearing.  Texas Rule of Appellate Procedure
21.4(a)-(b) provides, in relevant part, the following procedure for filing and
amending a motion for new trial filed in a criminal case:

(a)       To file.  The defendant may file a motion for new
trial before, but no later than 30 days after, the date when the trial court
imposes or suspends sentence in open court.

 

(b)       To amend.  Within 30 days after the date when the
trial court imposes or suspends sentence in open court but before the court
overrules any preceding motion for new trial, a defendant may, without leave of
court, file one or more amended motions for new trial.

 

Tex. R. App.
P. 21.4(a)-(b).  In addition, a defendant may not amend or enlarge his
original motion with additional claims after the thirty-day period has expired,
except when the State fails to object to the addition at the time those claims
are raised.  Clarke v. State, 270 S.W.3d 573, 580-81 (Tex. Crim. App.
2008) (citing State v. Moore, 225 S.W.3d 556, 570 (Tex. Crim. App.
2007)); see Jordan v. State, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994)
(en banc) (setting out that the purpose of the hearing is for a defendant to
fully develop the issues raised in this motion for new trial).  Thus, rule
21.4(b) permits the State, after properly objecting, to insist that the trial court
rule only upon the timely motion for new trial as originally filed or timely
amended, but not as untimely amended.  See Tex. R. App. P. 21.4(b); see also Moore, 225 S.W.3d at
570.

At the hearing on his motion for new
trial, which occurred after the relevant thirty-day period had expired, Cueva
attempted to enlarge or amend his original motion with additional
ineffective-assistance claims.  See Clarke, 270 S.W.3d at 580-81.  The
State objected to these additional claims.  Because the State did so, the
trial court should have ruled only on the motion for new trial as it was
originally filed.  See Tex. R.
App. P. 21.4(b); Moore, 225 S.W.3d at 570.  Instead, the trial
court allowed Cueva to present evidence on his additional claims and
considered this evidence, in error.  See Tex. R. App. P. 21.4(b); Moore,
225 S.W.3d at 570.

Nevertheless, it is well settled that ineffective assistance
of counsel may be raised without the necessity of a motion for new trial.  See
Robinson v. State, 16 S.W.3d 808, 809-13 (Tex. Crim. App. 2000).  We, therefore,
will consider these additional claims and arguments under the Strickland
standard, based only on the trial record, without giving
consideration to the evidence presented at the hearing on Cueva's motion for
new trial or to the trial court's findings relevant to those claims.  See
Strickland, 466 U.S. at 687; see also Tex. R. App. P. 21.4(b); Moore, 225 S.W.3d at 570.

In addition, Cueva raises other
claims of ineffective assistance of counsel for the first time on appeal.  The Strickland
standard also applies to these new claims.  See Strickland, 466 U.S. at
687.  Therefore, the claims raised for the first time at the hearing on the
motion for new trial and objected to by the State and those made for the first
time on appeal will be reviewed together.

C.  Discussion

 

1.  Claims Raised in Motion for New Trial

 

We will first address the ineffective-assistance-of-counsel
claims that Cueva presented in his motion for new trial and now asserts as part
of his third and fourth issues on appeal.  The trial court denied Cueva's
motion and filed findings regarding these claims.  As set out above, we will
review the claims raised in Cueva's motion for new trial under an abuse of
discretion standard.  See Charles, 146 S.W.3d at 208.

a.  Cueva's
Written Statement

 

Cueva first asserts that counsel's
performance was deficient and that he was harmed when counsel (1) failed to
investigate matters and present evidence related to the voluntariness of his
written statement, (2) withdrew the motion to suppress his written statement
when counsel changed trial strategy, and (3) failed to request a jury
instruction on voluntariness.

A defendant's statement must be
voluntary to be admissible.  U.S. Const.
amends. V & XIV; Jackson v. Denno, 378 U.S. 368, 376-77 (1974); see
Tex. Code Crim. Proc. Ann. arts.
38.21, 38.22 § 2(b) (West 2005) (providing that a statement is admissible if
made freely and voluntarily without compulsion or persuasion and the defendant
knowingly, intelligently, and voluntarily waives statutory rights).  A
confession may be involuntary under the Due Process Clause only when there is
police coercion or overreaching.  See Colorado v. Connelly, 479 U.S.
157, 163-66 (1985); Oursbourn v. State, 259 S.W.3d 159, 169-71 (Tex.
Crim. App. 2008).  However, even absent coercion or overreaching, a confession
may still be involuntary under the broader protections of Texas statutory law. 
See Tex. Code Crim. Proc. Ann. art.
38.22 § 6.  The court of criminal appeals has set out the following fact
scenarios, among others, that can raise a state-law claim of involuntariness: 
"(1) the suspect was ill and on medication and that fact may have rendered
his confession involuntary; (2) the suspect was mentally retarded and may not
have 'knowingly, intelligently and voluntarily' waived his rights; [or] (3) the
suspect 'lacked the mental capacity to understand his rights' …."  Oursbourn,
259 S.W.3d at 172-73.

When assessing the reasonableness of
an attorney's investigation, a reviewing court must consider the quantum of
evidence already known to counsel and whether the known evidence would lead a
reasonable attorney to investigate further.  Ex parte Martinez, 195
S.W.3d at 721 (citing Wiggins v. Smith, 539 U.S. 510, 527 (2003)).  The
Supreme Court has set out the following concerning the duty to investigate:

Strategic choices made after thorough
investigation of law and facts relevant to plausible options are virtually
unchallengeable; and strategic choices made after less than complete
investigation are reasonable precisely to the extent that reasonable
professional judgments support the limitations on investigation.  In other
words, counsel has a duty to make reasonable investigations or to make a
reasonable decision that makes particular investigations unnecessary.  In any
ineffectiveness case, a particular decision not to investigate must be directly
assessed for reasonableness in all the circumstances, applying a heavy measure
of deference to counsel's judgments.

 

Wiggins, 539 U.S. at
521-23; see Ex parte Martinez, 195 S.W.3d at 721; Ex parte Briggs,
187 S.W.3d at 466-67.  In Strickland, the Supreme Court concluded that
"the decision not to seek more character or psychological evidence than
was already in hand was likewise reasonable" and that "[t]rial
counsel could reasonably surmise from his conversations with respondent that
character and psychological evidence would be of little help."[7]  466 U.S. at
699.  In addition, the defendant himself bears the primary duty to divulge to
his attorney evidence of his own physical and emotional conditions that might
have a bearing on the issues at trial.  See Ex parte Martinez, 195
S.W.3d at 738 (providing that "the failure to present evidence of the
alleged sexual abuse is borne primarily by applicant, as he had ample
opportunity to divulge this evidence to his lawyer … before trial"). 
Also, when the facts adduced at trial and at any hearings concerning
ineffectiveness do not show that the defensive issue in question would have
been viable, trial counsel is not deficient for failing to further investigate
and pursue that defense at trial.  See Ex parte Martinez, 195 S.W.3d at
724; Ex parte Lilly, 656 S.W.2d 490, 493 (Tex. Crim. App. 1983) (en
banc).

In this case, the trial court found
credible counsel's testimony, given at the hearing, regarding Cueva's written
statement given to the police and its voluntariness.  Specifically, the trial
court's findings set out that the following testimony, provided by counsel at
the hearing, was credible:  (1) "[counsel] changed his initial strategy of
attempting to exclude Cueva's statement and instead attempted to use the
statement at trial to show how the investigation had been 'botched' by the
police" when they allowed "the video recording to cut off in the
middle of the taped statement and then attempt[ed] to complete the statement
with an unrecorded written confession"; (2) "[counsel] did not
believe he needed to have Cueva psychologically examined" based on meetings
with Cueva and with members of his family; and (3) "no one from Cueva's
family mentioned that he was slow in school or expressed concern with his
mental or psychological condition."  The trial court also found that
counsel "made a reasonable determination, based on the facts available to
him at the time, that he did not need a professional evaluation of, or further
investigation into, Cueva's psychological condition" and "[t]hus, had
no reasonable grounds to oppose or question the voluntariness of the statement
based on Cueva's psychological condition."

As part of its findings, the trial court addressed the
opinions rendered by Paul Hamilton, Ph.D., a psychologist
who, after trial, examined Cueva for the defense to determine whether he
understood his Miranda warnings and the sworn, written statement.  The
trial court found "implausible the opinions rendered by Dr. Paul Hamilton
… "that Cueva's 'emotional disturbance in combination with certain
personality characteristics … led him to sign a sworn, written statement
without fully reading it and understanding its content, thereby rendering it
unknowing and involuntary' … especially in light of the controverting affidavit
and report of … Joel Kutnick[, M.D.,] disputing this opinion and finding 'no
specific cognitive defects or attentional disorder.'"  See Lewis,
911 S.W.2d at 7.

The trial court further found that,

[counsel's] abandonment of the motion
to suppress and his failure to ask for a voluntariness instruction to the jury
charge did not fall below an objective standard of reasonableness under the
prevailing professional norms, in light of the fact that [counsel] had no
reason to believe that Cueva could raise a legitimate challenge to the
voluntariness of the statement.

 

It concluded by finding "that abandonment
of the motion to suppress was a reasonable trial strategy under the
circumstances in order to use the statement against the police and to show how
the overall investigation had been mishandled."

We also note that absent from the
record is any indication that Cueva himself expressed to his trial attorney
that he was too slow or emotionally impaired to voluntarily make the statement
in question.  See Ex parte Martinez, 195 S.W.3d at 738.  Rather, at
trial, Cueva claimed only that he did not read the statement because he knew
the officer in question and trusted him to have typed it up correctly.

Therefore, deferring to the trial
court's findings of facts regarding the credibility and demeanor of the
witnesses and viewing the evidence in the light most favorable to the trial
judge's rulings, see Gamboa, 296 S.W.3d at 584, we conclude that the
trial court's decision that counsel's actions in this regard were not deficient
was not an abuse of discretion.  See Charles, 146 S.W.3d at 208; see
also Strickland, 466 U.S. at 687.  Cueva has not demonstrated that counsel
performed "below an objective standard of reasonableness" on this
basis.  See Ex parte Briggs, 187 S.W.3d at 466.

b.  "Victim"
Language

 

Cueva complains that counsel’s
actions were deficient when counsel referred to A.G. as the victim at least
five times during the course of the trial and, by his actions, conceded that
Cueva had committed a crime.  He contends that counsel's purported strategic
explanation for his conduct was unsound.  Cueva also asserts that the
prejudicial effect of counsel’s use of this word was compounded when the State
and its witnesses described A.G. as the victim twenty-three times during the
guilt-innocence stage, without objection.  In response, the State argues the
following:

"Victim" is a convenient
label that identifies who the witnesses and attorneys are arguing about.  It is
a more common and commonly understood term, and less stuffy than
"complainant," less awkward than continuing to refer to the person as
the "alleged victim," and does not suggest what may be perceived as
inappropriate familiarity in referring to the person by their [sic] name. 
Moreover, in view of the vigorous defense presented in the present case, there
should have been no doubt in the jury's mind that it was merely being used as a
convenient label and not as any sort of admission that the crime actually
occurred.

 

Cueva cites Talkington v. State
and Veteto v. State for the proposition that references to the
complainant as the "victim" are improper when made by the trial court
because they constitute comments on the weight of the evidence.  See
Talkington, 682 S.W.2d 674, 674-75 (Tex. App.—Eastland 1984, pet. ref'd)
(explaining
that the trial court's reference in its charge to the "victim" in a
rape case was an improper comment on the weight of evidence because there was
no dispute that sexual intercourse had occurred and the sole issue was whether
it was consensual and whether the complainant was truly a "victim"); Veteto,
8 S.W.3d 805, 816-17 (Tex. App.—Waco 2000, pet. ref'd), abrogated on other
grounds by State v. Crook, 248 S.W.3d 172, 174-75 (Tex. Crim. App. 2008)
(determining
that the trial court "gave credence to [the complainant's] testimony that
the assaults occurred and that she was, indeed, a victim" by referring to
the complainant as the victim instead of the alleged victim and concluding that
the trial court commented on the weight of the evidence by failing to refer to
A.L. as the "alleged" victim).  Cueva asserts that references to
“victim” by lawyers and witnesses are equally improper and unfairly
prejudicial, not because they are comments on the weight of the evidence, but
because the references suggest personal opinions that a crime occurred.

Cueva refers this Court to Craig
v. State and Doherty v. State as cases that are sufficiently
analogous to the present case so as to lend support to his argument.  See
Craig, 847 S.W.2d 434, 435-36 (Tex. App.—El Paso 1993, no pet.); Doherty,
781 S.W.2d 439, 441-42 (Tex. App.—Houston [1st Dist.] 1989, no pet.).  On
remand, the Craig Court reviewed counsel's effectiveness only at the
punishment stage, not the guilt-innocence stage, and considered the effect of
his performance by applying the then-accepted Duffy standard, not the Strickland
standard.[8]  Craig,
847 S.W.2d at 435-36 (citing Ex parte Duffy, 607 S.W.2d 507, 514 n.14
(Tex. Crim. App. 1980) (explaining that the Duffy test for effectiveness
of counsel in the punishment phase of a non-capital offense was, first, whether
counsel was reasonably likely to render effective assistance, and second,
whether counsel reasonably rendered effective assistance).  These facts alone
distinguish Craig from the present case.  Nonetheless, in its original
opinion, the El Paso Court had found that counsel's actions during the
guilt-innocence stage were deficient when, among other things, counsel framed
questions on cross-examination in a manner that accepted "a State-oriented
interpretation of the circumstantial evidence and implications of the witness's
testimony."[9]  Id. at
435 (citing Craig v. State, 783 S.W.2d 620, 625-26 (Tex. App.—El Paso
1989) rev'd, 825 S.W.2d 128 (Tex. Crim. App. 1992) (en banc)).  On
remand, the court further concluded that "[g]iven these [eight] instances
of deficient performance of counsel throughout the trial, [including the one
noted above,] we are constrained to find that [Craig] did not receive
reasonably effective assistance of counsel at the punishment stage of
trial."  Id. at 435-36.  The Craig court reversed the
judgment and remanded for a new trial only on punishment.  Id. at 436.

The Doherty Court determined
that counsel's omissions, including his failure to call certain witnesses and
to object on numerous legal grounds to the State's questions and to the
admissibility of exhibits at the guilt-innocence stage, met both prongs of Strickland. 
781 S.W.2d at 442.  Concluding that counsel's ineffective assistance warranted
remand for a new trial, the First Court of Appeals added the following:

However, [counsel] did not stop
there.  Aside from his omissions, [counsel] himself made remarks prejudicial to
appellant.  [Counsel's] remarks to appellant, "you didn't take all the
money?" and, "What did you do, hit him over the head first?"
were heard 15-20 feet away.  Fleming essentially admitted his client's guilt in
the presence and hearing of the jury.

 

We find that, considering the totality
of [counsel's] representation of appellant, [counsel's] performance did not
meet the standard of reasonably effective assistance of counsel.

 

Id.

Although both Craig and Doherty
found multiple deficiencies in the respective counsel's performance, none
of the deficiencies involved the use of the word "victim."  Specific
to Cueva's argument, Craig's counsel framed questions on cross-examination in a
manner that accepted the State's interpretation of the evidence.  See Craig,
847 S.W.2d at 435.  Doherty's counsel asked him, with the jury nearby, if he
took all the money and if he hit the victim over the head first.  See Doherty,
781 S.W.2d at 441-42.  Counsel's performance in each case arguably suggests a
personal opinion that a crime occurred.  We cannot conclude the same through Cueva's
counsel's use of "victim" or through his failure to object to
another's use of the word, as Cueva urges.

This conclusion is supported by the
trial court's findings in this case.  It found counsel's testimony regarding
references to the complainant as "victim" credible; specifically,
that counsel did not object to the use of "victim" "because he
did not believe it was practical to restrict the labels used to identify the
parties in this manner" and "because he did not believe the
references were harmful [to the defense], because jurors expected the use of
such terms and were not influenced by their use."  The trial court found
that counsel's performance as it related to the use of the word
"victim" was not deficient, and specifically, the court found that
counsel's own use of the term was not deficient "in light of the fact that
such terms are commonly used at trial in a neutral manner to describe the
events in question and, in context, carry no implication that the person using
such terms has an opinion one way or the other about the guilt of the
defendant."  The trial court further found that any deficient performance
regarding use of the "victim" language "did not cause prejudice,
and specifically that there is not a probability sufficient to undermine
confidence in the outcome that, but for the complained-about deficiencies, the
result of the proceeding would have been different."

We agree—because the term
"victim” is relatively mild and non-prejudicial, especially given that
courts have held invocation of far stronger terms did not amount to reversible
error.  See Lopez v. State, 162 Tex. Crim. 454, 286 S.W.2d 424, 425
(Tex. Crim. App. 1956) (holding that the use of the word "slaughter"
did not cause injury to appellant); Espalin v. State, 90 Tex. Crim. 625,
237 S.W. 274, 279 (Tex. Crim. App. 1921) (concluding that the prosecutor's
reference to appellant as "this killer" was not so prejudicial as to
injure appellant's rights); Jones v. State, 900 S.W.2d 392, 397 (Tex.
App.—San Antonio 1995, pet. ref'd) (deciding that the prosecutor's use of the
term "sex slave" in regard to the complainant was not reversible
error); White v. State, 699 S.W.2d 607, 615 (Tex. App.—Dallas 1985, pet.
ref'd) (determining that the use of the word "butcher" in reference
to the appellant was not improper); see also Byler v. State, No.
03-01-00012-CR, 2002 Tex. App. LEXIS 1667, at *9-10 (Tex. App.—Austin Mar. 7,
2002, pet. ref'd) (mem. op., not designated for publication) (holding that
counsel was not ineffective for failing to object to the State's
characterization of complainant as "victim").  And appellate courts
in Texas have even used the word "victim" in writing their opinions. 
See, e.g., Villalon v. State, 791 S.W.2d 130, 134 n.1 (Tex. Crim. App.
1990) (en banc) ("In this opinion the victim of appellant's sexual assault
is referred to as the victim.").

Therefore, deferring to the trial
court's findings of facts regarding the credibility and demeanor of the
witnesses and viewing the evidence in the light most favorable to the trial
judge's ruling, see Gamboa, 296 S.W.3d at 584, we conclude that the
trial court's decision that counsel's actions were not deficient in this regard
and that any deficiency was not prejudicial, was not an abuse of discretion.  See
Charles, 146 S.W.3d at 208; see also Strickland, 466 U.S. at 687. 
Cueva has not demonstrated that counsel performed "below an objective
standard of reasonableness" on this basis.  See Ex parte Briggs,
187 S.W.3d at 466.

c.  Testimony
that Sexual Assault Occurred

 

Cueva also complains that references
to where the crime occurred or the sexual assault took place and counsel's
failure to object to the use of this language improperly communicated the
opinions of the witnesses and counsel that Cueva was guilty.  He asserts that
counsel's purported strategic explanations were unsound and did not justify his
eliciting or failing to object to references and opinion testimony that a
sexual assault occurred; thus, this conduct constitutes deficient performance.

 

Cueva first complains of exchanges
between counsel and Detective Eduardo Tagle that occurred over approximately
sixty pages of trial transcript.  Cueva directs this Court to ten times
Detective Tagle made reference, without objection, to where the crime or sexual
assault occurred.  Furthermore, in response to counsel's question "Who
took you in there and showed you these beds and told you this what you had been
calling the scene where the sexual assault took place?", Detective Tagle
responded, "Well, the mother explained to me which bed the sexual assault
took place on and which bed he jumped over to."

Importantly, the trial court found
credible counsel's "testimony that he did not object to testimony by the
detective referring to the 'assault' because he did not perceive these
references as suggesting that the assault or crime actually occurred and
because jurors expect officers to testify in this manner."  The trial
court also found credible counsel's "testimony that his questioning of the
detective referring to the location where the sexual assault occurred was
designed to show that [A.G.'s] mother claimed something happened without
actually seeing it."  Thus, the trial court concluded that counsel
"had a strategic reason for phrasing his questions in the way he
did."

Cueva also directs us to the
following exchange between counsel and Nurse McLaughlin, regarding her
examination of A.G.:

Q.        So
what is the point of the exam actually?

 

A.        The point of the exam is to find out from the child what
happened, get her history, and to treat her medically so that she does not have
an infection or something that needs to be treated.

 

Q.        And
you also gather some evidence, correct?

 

A.        I gather evidence if it falls within the period of time
that evidence collection is recommended, and I do it as a courtesy but nothing
else.

 

Q.        Did
it happen in this case?

 

A.        It
did.

 

Q.        Because
it fell within the 96 hour period, correct?

 

A.        Right.  Because I saw [A.G.] right after something had
happened to her.

 

Q.        Is that the impression you got from … the mother of
[A.G.], that she brought her there immediately after this happened?

 

A.        I had that the time of the incident on my chart was
8/5/07 at 2200 or 10 o'clock at night.

 

…

 

Q.        On page 2 of 6, we have post-assault hygiene.  You have
that page in front of you?

 

A.        Yes,
I do.

 

…

 

Q.        Post-assault
hygiene which means after the assault happened?

 

A.        Before
she saw me, yes.

 

Q.        In
between the assault and seeing you –

 

A.        Correct.

 

Q.        –
[A.G.] told you that she had wiped and washed herself?

 

A.        She
had wiped.

 

As to this complained-of testimony,
the trial court found credible counsel's "testimony that his question
regarding what [A.G.] told the nurse 'after the assault took place' merely
restated the victim's words and did not communicate [counsel's] own opinion
that an assault occurred."  The trial court also generally found credible
counsel's "testimony that his reference to the 'scene of the crime' did
not communicate to the jury the belief that a crime actually occurred" and
"that references to … the 'scene of the crime' during the course of a
trial do not cause harm to the defense."  Finally, the court found the
counsel's failure to object to references by the prosecutor or the witnesses to
"scene of the crime" and to statements suggesting that a crime
occurred and his own use of the terms was not deficient performance "in
light of the fact that such terms are commonly used at trial in a neutral
manner to describe the events in question and, in context, carry no implication
that the person using such terms has an opinion one way or the other about the
guilt of the defendant."

Cueva also suggests that counsel was
ineffective when he did not object to Detective Arturo Gonzalez's testimony, on
direct examination by the State, that the absence of semen did not cause him to
believe Cueva was innocent and, later, that he believed "there was a
sexual act going on."  However, with regard to Detective Gonzalez's first
response, the State's initial question merely elicited his conclusion that the
absence of semen on A.G.'s panties did not show that Cueva could not have
committed the crime and, with regard to Detective Gonzalez's later response,
that he believed there was a "sexual act going on," counsel did
object, and the trial court sustained the objection.

Finally, Cueva directs us to the use
of "after the assault took place" in the following question asked by
counsel of A.G.'s mother during cross-examination:  "You understand [A.G.]
has told the nurse that she did all three of those things after the assault
took place and before she was examined?"  When the question is read in
context, however, it is apparent that counsel was attacking the credibility of
the child by emphasizing inconsistencies between what A.G. told the nurse and what
her mother believed happened, not that he was conceding a crime occurred, as
argued by Cueva.

Again deferring to the trial court's
findings of facts regarding the credibility and demeanor of the witnesses and
viewing the evidence in the light most favorable to the trial judge's rulings, see
Gamboa, 296 S.W.3d at 584, we conclude that the trial court's decision that
counsel's actions in regard to the use or failure to object to the use of such
complained-of language were not deficient was not an abuse of discretion.  See
Charles, 146 S.W.3d at 208; see also Strickland, 466 U.S. at 687. 
Cueva has not demonstrated that counsel performed "below an objective
standard of reasonableness" on this basis.  See Ex parte Briggs,
187 S.W.3d at 466.

d.  Testimony
that A.G. Was Telling the Truth[10]

 

Cueva contends that his counsel was
ineffective when he elicited testimony from three witnesses—A.G.'s mother, a
nurse, and a counselor—that they believed A.G. was
telling the truth about the allegations of sexual assault.  He describes this
testimony as prejudicial.  Cueva asserts that counsel's strategic explanation
for this conduct was incredible and did not justify his actions.  We disagree.

A direct opinion on the truthfulness
of the child, from either a lay witness or an expert witness, is inadmissible. 
Yount v. State, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993) (en banc); Sessums
v. State, 129 S.W.3d 242, 247 (Tex. App.—Texarkana 2004, pet. ref'd); Fisher
v. State, 121 S.W.3d 38, 41-42 (Tex. App.—San Antonio 2003, pet. ref'd). 
Additionally, an expert may not offer an opinion that the class of persons to
which the complainant belongs, such as child sexual abuse victims, is truthful
or worthy of belief.  Pavlacka v. State, 892 S.W.2d 897, 902 n.6 (Tex.
Crim. App. 1994) (en banc); Yount, 872 S.W.2d at 712.  This type of
testimony is inadmissible because it does more than "assist the trier of
fact to understand the evidence or to determine a fact in issue"; it
decides an issue for the jury.  Yount, 872 S.W.2d at 709.  An expert
may, however, testify to behaviors and traits that might constitute indicia of
manipulation.  Schutz v. State, 957 S.W.2d 52, 70 (Tex. Crim. App.
1997).  For example, "[a] party may attack the credibility of a witness or
other declarant by offering," among other things, "evidence that the
person is, in general, the kind of person who is easily manipulated," id.,
or an expert may offer "testimony that a child exhibits behavioral
characteristics that have been empirically shown to be common among children
who have been abused" because it "is relevant and admissible as
substantive evidence under [r]ule 702."  Perez v. State, 113 S.W.3d
819, 832 (Tex. App.—Austin 2003, pet. ref'd), overruled on other grounds,
Taylor v. State, 268 S.W.3d 571, 587 (Tex. Crim. App. 2008).

(i.)  A.G.'s
Mother

First, Cueva complains of the
following testimony counsel elicited from A.G.'s mother on cross-examination:

Counsel:        Do you have any evidence to present to this jury
that this incident was repeated on prior occasions?

 

…

            

Mother:           My daughter should be more than—she told me.  I
believe her.  I walked in on it.  I don't know what other evidence you need.

 

After A.G.'s mother testified in this
manner, counsel elicited testimony from A.G.'s mother that she believed
everything her daughter told her.  Counsel then asked questions about
inconsistencies between what A.G. told her mother and what A.G. told the nurse
immediately after the incident.

As to this complaint, the trial court
found "credible [counsel's] testimony [at the hearing on the motion for
new trial] that it was his strategy to elicit testimony from [A.G.'s mother]
that she believed [A.G.'s] accusations and that she always believed [A.G.],
because it allowed [counsel] to contradict this by showing that [A.G.] lied
about matters that occurred after the assault."  The court also found
credible counsel's "testimony that [A.G.] could not have been truthful to
both her mother and the nurse examiner because of conflicts in what she told
the two witnesses, even though both witnesses were adamant that [A.G.] did not
lie."  The trial court further found that counsel's actions were based on
reasonable trial strategy to attack the credibility of A.G.'s mother and that
deficient performance, if any, did not cause prejudice "in light of the
fact that the opinion testimony was given by witnesses who had shown themselves
to be biased against Cueva and thus, the witnesses could be expected to hold
such opinions."  The trial court's finding of "no prejudice" is
further supported by the line of cases that stand for the proposition that the
admission of a mother's testimony regarding her child's character for
truthfulness is harmless.  See, i.e., Fisher, 121 S.W.3d at 41 (holding
any error in allowing an aunt and legal guardian to testify to complainant's
character for truthfulness was harmless and stating, that "[a] jury would
have expected … Alice's aunt and legal guardian who raised Alice as her own
child for six years prior to trial, to testify that Alice was truthful"); In
the Matter of G.M.P., 909 S.W.2d 198, 206 (Tex. App.—Houston [14th Dist.]
1995, no pet.) ("A jury would expect a mother to testify that her son was truthful,
and would likely view such testimony with natural skepticism.").

(ii.)  Nurse
Examiner McLaughlin

Cueva also complains of counsel's
eliciting from McLaughlin, the sexual assault nurse examiner, that all
five-year-old children tell her the truth.  This question followed testimony by
McLaughlin about A.G.'s examination.  McLaughlin indicated, through her
testimony, that it would not matter to her if the things A.G. told her about
her "post-assault hygiene" were not true because she was five.  When
asked by counsel, "So when they are five it really does not matter to you
whether or not what they are telling you is the truth?", McLaughlin
testified that "[t]hey are usually pretty on about what they've
done."  After obtaining testimony regarding details of A.G.'s
"post-assault hygiene," the following cross-examination occurred:

Counsel:        Can
a five year olds [sic] be manipulated?

 

Nurse:            Can they be manipulated?  Sometimes, sure. 
Everybody can.

 

Counsel:        Do you know if [A.G.] is a five-year old subject to
being manipulated?

 

Nurse:            I think ever [sic] person is subject to being
manipulated, sir, so yeah, she could be manipulated.

 

Counsel:        And
finally, do all five-year olds tell you the truth?

 

Nurse:                        Pretty
much so, yeah.

 

McLaughlin's opinion testimony that
A.G. is, in general, the kind of person who could be manipulated was
admissible.  See Schutz, 957 S.W.2d at 69-70; Perez, 113 S.W.3d
at 832.  Counsel then asked McLaughlin if all five-year-old children tell her
the truth.  He did not ask if five-year-old sexually-abused children—the
specific class of persons to whom this complainant belongs—tell her the truth. 
See Pavlacka, 892 S.W.2d 902 n.6; Yount, 872 S.W.2d at 712. 
Still referring generally to the broad class of all five-year-old children,
counsel asked, "Never had a five-year old tell you something that was not
true?", to which McLaughlin answered,

Most five-year olds would rather not
tell me anything or tell me like it is.  Sure, I have had one or two lie to me
in some way.  I am sure one of them would tell me that the blue monster came
out of the closet.  I have had a couple do that.  I have had a five-year old
tell me that somebody was an alien.  But in their mind, this was true to them. 
I have had five-year olds lie to me but in that content, it would depend on the
content.

 

Relevant to the foregoing, the trial
court found credible counsel's "testimony that the reason he elicited
testimony from the sexual assault nurse examiner that all five-year-olds
generally tell her the truth" was "to demonstrate that her opinions
were baseless, biased, and absurd."  The trial court found credible
counsel's "testimony that during direct examination, the nurse indirectly
conveyed her opinion that A.G. was telling the truth" and that counsel's
elicitation of testimony from McLaughlin concerning her belief about the
truthfulness of A.G. was based on reasonable trial strategy to attack her
credibility.  It also found that any deficient performance in such elicitation
did not cause prejudice "in light of the fact that the opinion testimony
was given by witnesses who had shown themselves to be biased against Cueva and
thus, the witnesses could be expected to hold such opinions."

 

(iii.)  Counselor
Ramos

Finally, Cueva challenges counsel's
cross-examination of Dennis Ramos, a licensed professional counselor, who testified that he knew he was going to testify at
Cueva's trial only one day before he did so and that he was not briefed on the
case by the prosecutor until the day he testified.[11] 
Cueva complains of counsel's actions when he elicited testimony from Ramos that, in his experience, it is "very rare that a child will
lie about sexual abuse" and that he had "never seen a younger child
lie about being abused."  This testimony occurred during the following
cross-examination of Ramos about his case load and the criteria or methodology
he uses:

Counsel:        How do you get those cases [you are maintaining at
this time]?

 

Ramos:          All different places.…  The children that are
actually abused that are referred to me are either brought in by their parents
or they are refereed to me by an agency ….

 

Counsel:        Now when you say "actually abused," how
is that determination made, that actual abuse has taken place?

 

Ramos:          By
the report of the child and also by medical exam.

 

Counsel:        Okay.  So we have either the child saying, I was
sexually abused, or some kind of medical examination's finding and making an
affirmative finding of sexual abuse?

 

Ramos:          Or
both.

 

Counsel:        Now, in your opinion, if a child says they are
sexually abused, is [sic] there any questions in your mind that the said abuse
has taken place?

 

Ramos:          I evaluate that, but my experience is that it's
very rare that a child will lie about those things.

 

Counsel:        Have you never met a child who has lied about
being sexually abused?

 

Ramos:          I have met probably two, and they were older
children, 14 or 15 years old.

 

Counsel:        How do you determine that they have lied about
their sexual abuse[?]

 

….

 

Ramos:          The only way that I know to determine that is if
they admit that they have lied.

 

Counsel:        So unless the child admits that he has lied about
it, we're going to take at face value the child has been sexually abused—

 

Ramos:          I—

 

Counsel:        By
the fact that they said that?

 

Ramos:          I generally evaluate the possibility of lying.  It
has been very rare that I have seen children lie about being abused, especially
in—I have never seen a younger child lie about being abused.

 

Then, through the series of questions
and answers set out below, counsel challenged Ramos's method of determining
whether a child is sexually abused which, as described by counsel, is based on
"subjective" criteria.  In this same exchange, counsel also elicited
testimony from Ramos that he agreed medical professionals also take the child's
claims at "face value" and believed this was a "valid
measure" of the child's truthfulness:

Counsel:        Well, I mean that's because you have already
determined the criteria for that is admitting that they have lied.

 

What you're
telling us is that you've never had a younger child who has claimed that they
have been sexually abused later admit that they weren't sexually abused; is
that right?

 

Ramos:          That's
correct.

 

Counsel:        You have never been able to actually objectively
determine whether or not any of these children have actually lied about it. 
Correct?

 

Ramos:          I have been able to establish when they told the
truth, when there's other evidence.  But as far as—

 

Counsel:        What percentage of cases have additional evidence,
objective evidence that you can look at besides the subjective complaint of
sexual abuse, in your practice?

 

Ramos:          I would say at least half have other corroborating
evidence, either a witness or medical—medical documentation about the abuse.

 

Counsel:        Okay. 
How many have had a witness?

 

Ramos:          Probably
about 20 percent.

 

Counsel:        Twenty percent witnesses come forward and say,
Yes, I watched sexual abuse take place?

 

Ramos:          Or
I discovered it or another child witnessed it, yes.

 

Counsel:        Okay.  Then what about the medical side of it? 
What do you usually regard as medical evidence of child abuse?

 

Ramos:          I take at face value what the nurses' and doctors'
report say,  If they—

 

Counsel:        Such as the doctors' reports provided by the
sexual assault nurse examines?

 

Ramos:          Yes.

 

Counsel:        Now, have you ever spoken with a sexual assault
nurse—a sexual assault nurse examiner about what criteria they look at in
determining whether or not sexual abuse has taken place?

 

Ramos:          Yes.

 

Counsel:        Do you realize that the same criteria that you
employ is the same criteria that they employ; that if, in fact, a child reports
a history of sexual abuse, they take that at face value?

 

Ramos:          That makes sense to me.  That does sound like a
valid measure.

 

Counsel:        Do you not see a problem with the circular nature
of that, that because a sexual assault nurse examiner said that the historian
reports it; and, therefore, I take it as face value, we now have a report that
you consider could corroboration, when, in fact, it's nothing more than what
you've already heard?

 

Ramos:          Well,
I was speaking of physical evidence.

 

In its findings, the trial court
found credible counsel's testimony that the reason he elicited the
complained-of testimony from Ramos was "to demonstrate the absurdity of
this premise, attack his credibility, and show that he was biased in favor of
the State, in view of the fact that counsel had not interviewed [A.G.] and was
not familiar with the present case."  The trial court further found
credible counsel's "testimony that it was his strategy to show that the
psychologist believed any child who did not later admit to lying and that it
was absurd for a [counselor] who had never interviewed the [complainant] to
render an opinion that children always tell the truth."  The trial court
also found, as it did for A.G.'s mother and the nurse examiner, that counsel's
elicitation of testimony from Ramos concerning his belief about the
truthfulness of children was based on reasonable trial strategy to attack his
credibility and that any deficient performance in such elicitation did not
cause prejudice "in light of the fact that the opinion testimony was given
by witnesses who had shown themselves to be biased against Cueva and thus, the
witnesses could be expected to hold such opinions."

Therefore, deferring to the trial
court's findings of facts regarding the credibility and demeanor of A.G.'s
mother, McLaughlin, and Ramos, and viewing the evidence in the light most
favorable to the trial judge's rulings, see Gamboa, 296 S.W.3d at 584,
we, too, conclude that the trial court's decision that counsel's actions in
this regard were the result of reasonable trial strategy, see Jaynes,
216 S.W.3d at 851, and any deficiency in his actions was not prejudicial.  See
Charles, 146 S.W.3d at 208; see also Strickland, 466 U.S. at 687. 
Cueva has, therefore, not demonstrated ineffective assistance of counsel on
this basis.  See Ex parte Briggs, 187 S.W.3d at 466.

e.  Testimony
that Cueva Threatened A.G.'s Mother

 

Cueva contends that counsel was also
ineffective when he elicited testimony from A.G.'s mother that A.G. said Cueva
threatened to hurt her mother if A.G. told anyone what he did to her.[12]  Specifically,
Cueva's trial counsel asked A.G.'s mother, "Did you ask [A.G.] what
happened?," and A.G.'s mother replied that A.G. told her that it was not
the first time and she did not tell her mother because Cueva said he
"would hurt mommy if [A.G.]" told her.  Cueva asserts that this testimony was inadmissible hearsay
because (1) counsel did not request, and the trial court did
not conduct, a mandatory article 38.072 hearing, see Tex. Code Crim. Proc. Ann. art. 38.072,
' 2 (West Supp. 2010); (2) A.G.'s
mother was not a proper outcry witness because she and McLaughlin testified
concerning A.G.'s statements about the same events, see Broderick v. State,
35 S.W.3d 67, 73 (Tex. App.—Texarkana 2000, pet. ref'd) (explaining
that testimony from more than one outcry witness is inadmissible under article
38.072 where the witnesses repeat the same events as related to them by the
complainant); and (3) the testimony was not about an outcry statement because
it did not describe the alleged offense.  See Tex. Code Crim. Proc. Ann. art. 38.072, ' 2 (providing,
inter alia, that "[t]his article applies only to statements that describe
the alleged offense"); Garcia v. State, 792 S.W.2d 88, 91 (Tex.
Crim. App. 1990) (en banc) (setting out, to be admissible, an outcry statement
must describe the alleged offense in some discernible manner).

Assuming without deciding that the
statements were inadmissible for any one of the three reasons set out by Cueva,
we nonetheless conclude that counsel's action in eliciting the response and not
objecting that it was non-responsive testimony was not ineffective assistance. 
This testimony occurred on cross-examination of A.G.'s mother after counsel
asked her if she had asked A.G. what happened.  Rather than giving a "yes"
or "no" response, A.G.'s mother began recounting what A.G. had told
her about the incident, that it was not the first time, and why she had not
said something earlier.  Instead of objecting, Cueva's counsel used this
testimony against A.G.'s mother, as inconsistent with her prior statement to
the police.  As Cueva acknowledges, A.G.'s mother admitted she did not include
these statements in her written statement to the police.  She testified that,
instead, she told the police and A.G.'s psychologist that A.G. told her this.

 

Following the motion for new trial
hearing, the trial court found credible counsel's "testimony that he was
able to impeach [A.G.'s] mother with her non-responsive testimony by showing
that the mother had not previously made these claims in the statement given to
the police."  The trial court further found credible counsel's
"testimony that it was his strategy to point out the mother's inconsistent
testimony and that she was changing things she said in her prior testimony,"
and that "this was a reasonable trial strategy in light of the fact that
the mother's credibility was a key factor at trial."  The court then found
that counsel's actions were not ineffective and not prejudicial.

Deferring to the trial court's
findings of facts regarding the credibility and demeanor of the witnesses and
viewing the evidence in the light most favorable to the trial judge's rulings, see
Gamboa, 296 S.W.3d at 584, we also conclude that the trial court's decision
that counsel's actions in this regard were not deficient and, even if they were
deficient, they were not prejudicial, was not an abuse of discretion.  See
Charles, 146 S.W.3d at 208; see also Strickland, 466 U.S. at 687. 
Cueva has not demonstrated that counsel performed "below an objective standard
of reasonableness" or that he was prejudiced by counsel's deficiency, if
any, on this basis.  See Ex parte Briggs, 187 S.W.3d at 466.

f.  Testimony
About Sexual Assaults of Small Children

 

Cueva next asserts that testimony
provided by McLaughlin—testimony Cueva describes as explaining "how most
rapists sexually assault small children"—was non-responsive, irrelevant
under rule of evidence 401, and even if relevant, unduly prejudicial under rule
of evidence 403.  He claims that counsel's failure to object to this testimony
constituted deficient performance.

 

On direct examination, the State
asked McLaughlin if, when she performed her examinations, she expected to find
genital trauma in the area of the female sexual organ,[13] even if a sexual
assault had just occurred.  In response, McLaughlin testified that "80
percent of the time [she] does not find injuries" although she looks for
injuries, "they are not there."  The State then asked McLaughlin to
"explain how the hymen is not injured through sexual assault," and
McLaughlin provided the following testimony:

Sexual assault can happen a lot of
ways like I said.  With small children, when people are trying to touch small
children, their aim is not to hurt them because if you hurt them, they are
going to tell.  So you don't want to hurt them or they are going to go running
off and tell.  We have found with smaller children, the anus is used a lot
because it is a lot more flexible and with proper lubrication and moistness, it
can be very slippery and non-painful for the child.  With the female sexual
organ, when you hit the hymen of a child that hasn't started her period yet, it
is a painful thing.  It hurts.  So most people that try to do sexual acts on
small children will do them between the lips and more like rub between the lips
and back towards the back, kind of like a hot dog bun upside down, rubbing
between the lips.  Because if they go in, they are going to hit that painful
area and they don't want to cause pain because then the kid is going to cry or
runaway or tell.

 

Cueva's trial counsel did not object,
and the State continued, "So when you examined A.G. …, what did you
see?"  In response, McLaughlin testified about what she found when she
examined A.G., specifically that there was red erythema or skin breakdown
throughout A.G.'s "private area."  She also testified as to how the
hymen is not injured through sexual assault.  McLaughlin explained that the
reason a sexual offender would commit the offense in the manner alleged in this
case was to avoid causing physical pain to the child and to decrease the
possibility that the child will "cry or run away or tell."

At the motion for new trial hearing,
when asked if counsel believed "it is admissible for an expert witness to
testify [about] what most offenders do?", counsel responded, "Not in
that context."  Counsel explained that "[he] did not feel that that
[testimony] was particularly objectionable at the time," and that it did
not fall into the category of "what most sex offenders do."  According
to counsel, his "appreciation of [McLaughlin's] answer to that question
was that it fell into the parameters of what the prosecutor asked her and [he
believed] it was a proper question."  Counsel continued testifying that
"how most sex offenders commit their offense" was not the question
asked.  Rather, according to counsel, "[t]he question was why—had to do
with the hymen and [McLaughlin] expanded on the answer somewhat to included
[sic] some things in there—" that he agreed were not responsive to the question. 
When asked why he did not object to the non-responsive testimony, counsel
stated that he did not want to be objecting unnecessarily and that he
"just did not think it was particularly harmful at that point in
time."  Cueva's counsel then asked, "Assuming for the sake of
argument that the prosecutor's question was appropriate, you do agree that the
statement of how most people commit child sex offense [sic] was improper
opinion or irrelevant at that point?", and counsel answered, "At the
very least irrelevant and possibly even improper opinion."

Following the hearing, the trial
court found that counsel's "failure to object to testimony explaining the
modus operandi of a typical sex offender" was not deficient performance. 
Specifically, the trial court found credible counsel's "testimony that he
did not object to testimony from [McLaughlin] concerning the medical reason
most sex offenders perform the type of assault they do on small children
because he did not believe this testimony was harmful."  The court also
found that any deficient performance did not cause prejudice "in light of
the fact that the testimony provided the jury with explanations that it could
have drawn from common sense and logical inferences."

Viewing the evidence in the light most
favorable to the trial judge's rulings, we again defer to the trial court's
findings of facts regarding the credibility and demeanor of the witnesses, see
Gamboa, 296 S.W.3d at 584, and conclude that the trial court's decision
that counsel's actions in this regard were not deficient and, even if they were
deficient, his actions were not prejudicial, was not an abuse of discretion.  See
Charles, 146 S.W.3d at 208; see also Strickland, 466 U.S. at 687. 
Cueva has not demonstrated that counsel performed "below an objective
standard of reasonableness" or that he was prejudiced by counsel's
deficiency, if any, on this basis.  See Ex parte Briggs, 187 S.W.3d at
466.

g.  Testimony by A.G.'s Mother that Cueva Assaulted
Her

 

Cueva complains that counsel's
performance was deficient when he failed to preserve error by requesting an
instruction to disregard or by moving for a mistrial after the trial court
sustained his objection to A.G.'s mother's testimony about a previous assault.[14]  Cueva asserts
that counsel's failure to preserve error was unintentional, not strategic—that
no sound trial strategy justified counsel's conduct.  

On re-cross examination by Cueva's
trial counsel, A.G.’s mother provided the following testimony:

Q. [Counsel]              You believed [A.G.] when she told you
that [Cueva] had told her not to tell anybody because he would hurt you?

 

A. [A.G.'s
Mother]     Yes, because he had before.

 

Q.                                You
believed her when she said that?

 

A.                                She's
known what he has done to me.

 

Later, on re-direct examination, the
prosecutor made the following comment to A..G.’s mother:  "You mentioned
when he asked about why she was afraid that he would hurt you. [sic]  You said
that she's known what he has done to me."  Outside the presence of the
jury, counsel successfully objected to this line of questioning when the trial
court ruled that counsel had not opened the door to testimony regarding a
previous assault against A.G.'s mother with his earlier questioning.  Although
the trial court sustained his objection, counsel did not request an instruction
to disregard and did not move for a mistrial.

Cueva relies on Robertson v. State
for his contention that no sound trial strategy justified counsel's failure to
preserve error.  See 187 S.W.3d at 484.  In Robertson, the court
of criminal appeals concluded "that appellant's trial lawyer performed
deficiently under the first prong of Strickland for eliciting testimony
from appellant at the guilt stage of his trial that appellant was already
incarcerated on two convictions that were pending on appeal."  Id.
at 486.  The court reasoned as following:

[I]n cases like this where appellant's
self-defense claim rested almost entirely on his credibility, the weight of
authority supports a holding that appellant's trial lawyer performed
deficiently under the first prong of Strickland by allowing the jury to
hear prejudicial and clearly inadmissible evidence [regarding two prior
convictions] because this evidence could serve no strategic value including
demonstrating that appellant is not a liar.

 

Id. (citations
omitted).  While Robertson provides general propositions of law
regarding the admission of extraneous acts testimony and character evidence, we
do not agree that Robertson supports a conclusion that there was no
sound trial strategy that would justify counsel's conduct in this case.

Based on our review of the record,
counsel may have strategically decided not to request an instruction to
disregard or a mistrial.  After A.G.'s mother provided testimony on re-cross
suggesting that Cueva hurt her on a prior occasion, Cueva's counsel immediately
directed the jury’s attention to the witness and attempted to impeach her
testimony about A.G.'s truthfulness by asking, “You never saw any indication of
fear with [A.G.] whenever you left her with him?”, to which she responded,
“No.”  Counsel then asked if A.G. had come up to her and tried to tell her
anything.  A.G.'s mother again responded, "No."  Also, the
prosecutor's comment about what Cueva had done to A.G.'s mother, although
objected to, was heard by the jury and arguably supported a strategy to show
her bias against Cueva.  Finally, counsel may have had a legitimate belief that
requesting further relief would have only highlighted the objectionable
testimony.  See Garcia v. State, 887 S.W.2d 862, 881 (Tex. Crim. App.
1994) (en banc), overruled on other grounds, Hammock v. State, 46 S.W.3d
889, 893 (Tex. Crim. App. 2001).  

The trial court found that counsel’s
“failure to ask for an instruction to disregard or a mistrial regarding improper
testimony by [A.G’s] mother about an extraneous assault” was deficient
performance.  The trial court also found no prejudice, setting out the
following finding:

However, the
[c]ourt finds that any deficient performance did not cause prejudice, and
specifically that there is not a probability sufficient to undermine confidence
in the outcome that, but for his failure, the result of the proceeding would
have been different, in light of the fact that similar testimony had been
elicited elsewhere and was consistent with [counsel’s] strategy to show that
[A.G.’s] mother and grandmother were biased against Cueva to the point that they
compelled [A.G.] to fabricate the present charges.[15]

 

As discussed above, the record
supports a finding that counsel made strategic decisions regarding this
testimony.  While decisions rooted in strategy typically do not constitute
deficient performance, Strickland, 466 U.S. at 689, we defer to the
trial court's finding of deficient performance in this instance because, affording
deference to the trial court's underlying historical fact determinations, see
Escobar, 227 S.W.3d 127, we agree that the error, if any, was not
prejudicial.  Similar testimony had been elicited elsewhere, and counsel's
actions were consistent with his trial strategy to show bias, a strategy that
should have been apparent to the jury throughout the trial.  Therefore, there
was not a probability sufficient to undermine confidence in the outcome that,
but for counsel's failure to ask for an instruction or a mistrial, the result
of the proceeding would have been different.  See Smith, 296 S.W.3d at
340.  Therefore, counsel's error was not so serious as to deprive Cueva of a
fair trial.  See id.

h.  Cueva Expressed Interest in
Having Anal Sex with A.G.'s Mother

 

Cueva contends that counsel also
performed deficiently when he did not object to testimony from A.G.'s mother
that Cueva expressed an interest in having anal sex with her, i.e., testimony
regarding extraneous conduct.  See Lopez v. State, 288 S.W.3d 148, 164
(Tex. App.—Corpus Christi 2009, pet. ref'd).  Cueva asserts that this testimony
was irrelevant to the issue of whether he anally assaulted A.G.  See Tex. R. Evid. 402, 404; Casey v. State,
215 S.W.3d 870, 879 (Tex. Crim. App. 2007).  Cueva further argues that, with
this testimony, the State portrayed him as a sexual deviant, encouraging the
jury to believe that he anally assaulted A.G. because he had expressed interest
in having anal sex with A.G.'s mother.  We construe this last complaint as a rule
403 argument—that, even if the evidence is relevant, its prejudicial nature far
outweighs the relevance of Cueva having anal sex with A.G.'s mother.  See
Tex. R. Evid. 403; Casey,
215 S.W.3d at 879.

At trial, during direct examination,
A.G.'s mother agreed that Cueva had expressed an interest in anal sex, which
she did not want to do.  When asked if she and Cueva engaged in anal sex,
A.G.'s mother answered, "I want to say we tried it about twice."

In support of his argument, Cueva
cites to Fox v. State, Brown v. State, and Doles v. State. 
See Fox, 283 S.W.3d 85, 93-96 (Tex. App.—Houston [14th Dist.] 2009, pet.
ref'd); Brown, 974 S.W.2d 289, 293-94 (Tex. App.—San Antonio 1998, pet.
ref'd) (op. on reh'g); Doles, 786 S.W.2d 741, 746 (Tex. App.—Tyler 1989,
no pet.).  Each case, however, is distinguishable from the present case because
each involves a counsel's reoccurring failure to object to numerous instances
of irrelevant testimony involving, for example, homosexual experiences,
promiscuity, and instability in the family–-numerous extraneous and prejudicial
matters which had a substantial and injurious effect on the verdict.  See
Fox, 283 S.W.3d at 93-96; Brown, 974 S.W.2d at 293-94; Doles,
786 S.W.2d at 746.  Cueva, in contrast, complains of one instance of testimony
involving what is arguably irrelevant and inadmissible evidence.

 

Furthermore, at the hearing on
Cueva's motion for new trial, counsel provided the following testimony
responsive to questions about Cueva engaging in anal sex with A.G.'s mother:

Q.        You
did [not] object to any of that testimony did you, sir?

 

A.        No.

 

Q.        How was testimony that Mr. Cueva had expressed an
interest in consensual anal sex with his adult sexual partner relevant to
whether he committed the offense of aggravated sexual assault of a child with
A.G.?

 

A.        It probably was not particularly relevant but I knew
where the prosecutor was going with it and expected that it would be allowed
because of the context of what she claims she had seen in the room.

 

Q.        So even though you recognize it probably was not
relevant, you did not object because you assume the court would overrule the
objection?

 

A.        I had strategic reasons for discussing that and I knew I
was going to discuss that with her as well.

 

Q.        Please
articulate those strategic reasons.

 

A.        They had been together in that room for a couple of
weeks prior to the incident taking place.  Mr. Cueva had explained to me that
he and [A.G.'s mother] had engaged in anal sex in that room, and it was my
theory that in all probability [A.G.] had observed this taking place and she
was relating what had taken place to her or she had seen taken place between
her mother and Charles rather than anything that had actually taken place with
her.  I think I told you that when we talked on the phone the other day.

 

Q.        So you made the argument to the jury that A.G. was
simply outcrying about things that she had observed and not things that had
really happened to her?

 

A.        Yeah, I don't remember.  Obviously, if you are asking
the question, I probably did not argue that to the jury.

            

Q.        Isn't it true that when we spoke on the telephone and I
asked you whether you intended for the jury to hear that Charles had expressed
an interest in anal sex with [A.G.'s mother], you said that was not strategic?

 

A.        It was not strategic that he had expressed the interest
but that they had engaged in it.  I was not interested in the jury hearing that
he had an interest in anal sex, no.

 

Q.        And
he denied that he had anal sex, correct?

 

A.        During
his cross-examination or—

 

Q.        Let me just stick with what we spoke about.  I asked
you, is it fair to say that that's not something that you intended for the jury
to hear, meaning the testimony regarding—

 

A.        His
interests in anal sex, yes.

 

Q.        And
you said that was not strategic?

 

A.        That's
correct.

 

Q.        Then didn't you tell me once that evidence came in, you
reacted to it and dealt with it the best that you could?

 

A.        Yeah. 
That's also true.

 

Q.        But you would have rather it not come in at all because
then you would not had to deal with it.  Fair to say?

 

A.        Yeah.

 

A defense counsel's failure to object
to certain improper evidence is not by itself an indication of ineffective
assistance of counsel.  Long v. State, 502 S.W.2d 139, 141 (Tex. Crim.
App. 1973).  "Counsel does not render ineffective assistance because he
used what another would consider a poor trial strategy."  Id.  In
this case, counsel may not have objected to the complained-of testimony in an
effort to provide an alternate explanation for A.G.'s allegations—that A.G. was
relating what she had seen taken place between her mother and Cueva rather than
anything that had actually taken place with her.  This is supported by
counsel's cross-examination of A.G.'s mother where he elicited testimony from
her that she and Cueva had been sexually active at times when the children were
there, implying that A.G. may have learned from this some of the things that
she told the psychologist that were not appropriate for a five-year-old to
know.

Moreover, the trial court found
counsel's testimony credible regarding his failure to object to the testimony
in question from A.G's mother because it was his strategy to show that A.G. was
relating what she had seen take place between Cueva and her mother, rather than
what Cueva had done to her.  The court found that this was reasonable trial
strategy and that counsel's failure to object was not deficient, and if it was,
it did not cause prejudice in light of the fact that the acts in question are
legal and not uncommon between consenting adults.

Therefore, deferring to the trial
court's findings of facts regarding the credibility and demeanor of the
witnesses and viewing the evidence in the appropriate light, see Gamboa,
296 S.W.3d at 584, we again conclude that the trial court's decision that counsel's
actions were not deficient and, even if they were deficient, they were not
prejudicial, was not an abuse of discretion on this ground.  See Charles,
146 S.W.3d at 208; see also Strickland, 466 U.S. at 687.  Cueva has not
demonstrated that counsel performed "below an objective standard of
reasonableness" or that he was prejudiced by counsel's deficiency, if any,
on this basis.  See Ex parte Briggs, 187 S.W.3d at 466.

i.  Jury
Charges

 

Finally, through his motion for new
trial, Cueva challenged counsel's failure to object to the guilt-innocence
charge on the basis that Cueva was allegedly convicted on a non-unanimous
vote.  He also asserts that counsel's failure to object to an instruction in
the punishment charge which improperly instructed the jury on how to calculate
his parole eligibility was deficient performance and, thus, harmed him.

(i.)  Guilt-Innocence Charge

 

On appeal, Cueva first contends that
because counsel did not object to the guilt-innocence jury charge which Cueva
claims improperly authorized conviction in Count 4 on a non-unanimous verdict,
his performance was deficient.  Having concluded, in the first issue, that no charge error
existed that violated Cueva's right to unanimity in his verdict in Count 4, we
now conclude that counsel's failure to object to the charge was not deficient
performance.  This is supported by the following motion for new trial
findings:  (1) counsel's "failure to object that the
jury charge regarding Count 4,[[16]] improperly
authorized conviction on a non-unanimous verdict" was not deficient; and
(2) even if counsel's non-action was deficient, it did not cause prejudice
"in light of the fact that penetration subsumes the act of contact and
there is no dispute that the evidence presented that [A.G.], if penetrated, was
also contacted by Cueva's sexual organ."

(ii.)  Punishment Charge

 

Cueva also complains that counsel's
failure to object to a portion of the punishment charge that erroneously
instructed the jury on how Cueva's parole eligibility would be calculated
constituted deficient performance.  He further contends that counsel's failure
to object prejudiced him because the erroneous parole charge allowed the jury
to grossly miscalculate his parole eligibility to his detriment.[17]

At the hearing on the motion for new
trial, counsel testified that his failure to object was inadvertent.  Agreeing
that it was "a harmful [c]harge," counsel testified that he
"read that portion, but the way it was phrased escaped [him] at the
time."  He also agreed that if he had "caught it," he would have
brought it to the court's attention."  When asked who prepared the
punishment charge, he responded as follows:  "They are usually prepared by
the D.A.'s office and then provided to the court.  I can't say for certain that
that is what took place in this case.  Sometimes the court manager has a Charge
that is used.  That's typically how it is done."

As set out in its findings of fact,
the trial court found credible counsel's "testimony that he inadvertently
failed to object to that portion of the punishment charge which incorrectly
instructed the jury on good[-]conduct time," and that this conduct was not
deficient.  The trial court further found that error, if any, regarding the
application of good conduct time did not cause prejudice "in light of the
fact that the charge instructed the jurors that they were not to consider how
good[-]conduct time and the parole law might be applied to Cueva, neither party
argued the concept of good[-]conduct time or how it might be considered in
evaluating parole eligibility …, and the nature of the offenses warranted
lengthy sentences."

Again, deferring to the trial court's
findings of facts regarding the credibility and demeanor of the witnesses and
viewing the evidence in the light most favorable to the trial judge's rulings, see
Gamboa, 296 S.W.3d at 584, we conclude that the trial court's decision that
counsel's actions regarding the alleged charge error at the guilt-innocence
stage and the alleged charge error at the punishment stage were not deficient,
and even if they were deficient, they were not prejudicial, was not an abuse of
discretion.  See Charles, 146 S.W.3d at 208; see also Strickland,
466 U.S. at 687; see also Robertson, 187 S.W.3d at 483 (explaining that
one is ensured the right to reasonably effective assistance of counsel, not
perfect assistance).  Cueva has not demonstrated that counsel performed
"below an objective standard of reasonableness" or that he was
prejudiced by counsel's deficiency, if any, on this basis.  See Ex parte
Briggs, 187 S.W.3d at 466.

2.  Additional Claims

 

In his third and fourth issues, Cueva
asserts additional claims of ineffective assistance of counsel that were raised
either (1) for the first time at the motion for new trial hearing and objected
to by the State, or (2) for the first time on appeal.  We will apply the Strickland
standard of review to these claims and will not review the additional claims
through the prism of a motion for new trial standard.  Gill, 967 S.W.2d
at 542.

a.  Guilt-Innocence Stage

(i.)  Oral Statements

 

Cueva argues counsel's assistance was
ineffective because he did not object to testimony from Detective Gonzalez, the
interrogating officer, regarding oral statements Cueva made while being
questioned.[18]  These oral
statements, however, were similar to, if not the same as, admissions made by
Cueva in his written statement, admitted at trial as State's Exhibit #3.  The
failure to object to cumulative evidence is harmless and will not support a
claim of ineffective assistance of counsel.  See Ingham v. State, 679
S.W.2d 503, 508 (Tex. Crim. App. 1984) (en banc); Duhart v. State, 890
S.W.2d 187, 190 (Tex. App.—Corpus Christi 1994, no pet.).

Counsel could also have made a reasonable
decision to allow the statements into evidence, along with the circumstances
under which they were made, in order to challenge the credibility of the police
and, by extension, the credibility of all those responsible for gathering and
presenting evidence against him.  Under the circumstances and affording great
deference to counsel's ability, we cannot conclude that it was not sound and
reasonable strategy on the part of counsel to decide to not object to testimony
regarding Cueva's oral statements in order to show how the investigation had
been mishandled.  See Jaynes, 216 S.W.3d at 851.  Therefore, we conclude
that counsel did not perform "below an objective standard of
reasonableness" in this regard, and counsel's decision to not object to
this testimony was not deficient.  See Ex parte Briggs, 187 S.W.3d at
466.

(ii.)  Cueva Minimized His
Conduct in His Written Statement

 

Cueva also contends that his trial
counsel was ineffective for failing to object to the following questions asked
of Detective Gonzalez by the State:

Q.        Have you found that defendants will sometimes minimize
what they did?

 

A.        Yes,
they do.

 

Q.        Did
you see that in this case?

 

A.        Yes,
I did.

 

Q.        How?

 

A.        As far as him saying, Oh, I just touched her.  After the
victim outcried to her mother, saying that she was penetrated, he minimized it,
saying, No, all I did was touch her.  I never penetrated her.  I just let her
touch me.  That's minimizing the situation.

 

Cueva asserts that, from this
testimony, one could infer that Cueva was not telling the truth, and thus
Detective Gonzalez's testimony would have been inadmissible, over timely
objection, under rules of evidence 701 and 702.  We disagree.

Police officers may generally offer
lay-opinion testimony concerning matters about which they have personal
knowledge and experience in their employment as a law enforcement officer and
specifically concerning the meaning of certain behavior of criminal suspects
they encounter.  See Fairow v. State, 943 S.W.2d 895, 898 (Tex. Crim.
App. 1997) (en banc).  The responses elicited from Detective Gonzalez do not
involve a direct opinion that Cueva lied in his statement or that Cueva was
guilty of the offense.  Rather, Detective Gonzalez testified to the facts he
observed—that Cueva admitted he touched the child but did not penetrate her and
that he let her touch him.  Detective Gonzalez explained that a defendant will
do this in an attempt to "minimize the situation."  For this reason,
we cannot conclude that Cueva has demonstrated that counsel performed below an
objective standard of reasonableness when he did not object to this testimony. 
See Ex parte Briggs, 187 S.W.3d at 466.

 

 

(iii.)  Victim-Impact Testimony

 

Cueva argues that counsel's
performance was also deficient when he did not object to testimony elicited by
the State from A.G.'s mother that, because of the incident, she gave up a job
in a "high school to shadow a special ed student," a job for which
she had just been hired, and that she "gave up everything" including
a wedding and a job.  Cueva contends that this victim-impact testimony was
improper at the guilt-innocence stage and that counsel had no sound strategic
reason for not objecting.

In support of his argument, Cueva
cites Miller-El v. State.  782 S.W.2d 892, 895 (Tex. Crim. App. 1990)
(en banc).  Concluding that victim-impact testimony did not have "any
tendency to make more or less probable the existence of any fact of consequence
at the guilt stage of trial," the Miller-El Court suggested that if
victim-impact testimony was relevant to any guilt issue, it would be admissible
at the guilt stage of trial.  Id. (citing Tex. R. Evid. 401) (defining "relevant evidence" as
evidence having any tendency to make the existence of a fact of consequence
more or less probable); Longoria v. State, 148 S.W.3d 657, 659-60 (Tex.
App.—Houston [14th Dist.] 2004, pet. ref'd) (concluding that victim impact
testimony is admissible at the guilt-innocence stage as a "circumstance of
the offense").

The State asserts, and we agree,
that, in this case, the mother's testimony regarding the impact of the crime on
her was relevant.  Cueva made it relevant as rebuttal to his defense that
A.G.'s mother manipulated A.G. to fabricate the assault so that they could get
back into the good graces of her family.  Based on the testimony that she lost
both her wedding plans and her new job, A.G.'s mother would not be gaining
anything by manipulating A.G. to make these charges.  Therefore, evidence of
the impact of the incident on A.G's mother, although typically irrelevant, did,
in this case, have a tendency to make more or less probable a fact of
consequence at the guilt stage; that is, whether Cueva committed the crime at
all.  See Miller-El, 782 S.W.2d at 895.  Since this testimony would have
been admissible on that basis, we cannot say that Cueva's trial counsel's
failure to object to the testimony fell below the objective standard of
professional norms.  See Ex parte Briggs, 187 S.W.3d at 466. 

(iv.)  Testimony that Cueva Assaulted A.G.'s Mother

            

For the first time on appeal, Cueva
complains of counsel’s failure to object to testimony provided by A.G on
cross-examination, testimony which Cueva alleges concerned a prior assault.[19]  He claims that
his trial counsel should have objected to the testimony as non-responsive and
as a violation of rule 404(b).  See Tex.
R. Evid. 404(b) (providing that extraneous-offense evidence is inadmissible
in order to show action in conformity with character).  We are not persuaded by
this argument because the testimony provided by A.G. detailed actions that
occurred after her mother observed the complained-of incident.

A.G.'s testimony reveals that her mother confronted Cueva
about his actions, and then they fought.  A.G. and her brother were sleeping in
another room and were awakened when their mother yelled and screamed at Cueva. 
A.G. saw Cueva and her mother hit each other.  Cueva pushed her mother into the
wall.  According to A.G.'s testimony, the police caught Cueva as he was leaving
the house, after the fighting and yelling occurred.  This testimony did not concern a
prior assault, as Cueva asserts.  Instead, this testimony was about the night
in question.

Any conduct on the part of a person
accused of a crime subsequent to its commission, which indicates a consciousness
of guilt may be received as a circumstance tending to prove that he committed
the act with which he is charged.  See Torres v. State, 794 S.W.2d 596,
598 (Tex. App.—Austin 1990, no pet.).  Specifically, unsettled demeanor may
show a consciousness of guilt.  Lassaint v. State, 79 S.W.3d 736, 744
(Tex. App.—Corpus Christi 2002, no pet.).  In addition, attempts to tamper with
a witness, and any criminal act designed to reduce the likelihood of
prosecution, constitutes evidence of "consciousness of guilt" on the
part of the defendant.  See Gonzalez v. State, 117 S.W.3d 831, 842 (Tex.
Crim. App. 2003); Wilson v. State, 7 S.W.3d 136, 141 (Tex. Crim. App.
1999); Ransom v. State, 920 S.W.2d 288, 299. (Tex. Crim. App. 1996) (en
banc) (op. on reh'g).

In the present case, evidence that
Cueva assaulted A.G.'s mother immediately after she confronted him was relevant
to show his unsettled and combative demeanor after the incident, which arguably
indicated a consciousness of guilt.  See Lassaint, 79 S.W.3d at 744;
Torres, 794 S.W.2d at 598.  And, as an assault against an adult witness, it
could be seen as tampering with the witness.  See Gonzalez, 117 S.W.3d
at 842.  Accordingly, the evidence was admissible, and although unexpectedly
volunteered by the witness on cross-examination, Cueva's trial counsel was not
ineffective for failing to object.

Affording great deference to trial
counsel's ability and indulging "a strong presumption that counsel's
conduct fell within the wide range of reasonable professional assistance,” see
Strickland, 466 U.S. at 689, and that his actions were the result of sound
and reasonable trial strategy, Jaynes, 216 S.W.3d at 851, we presume
that trial counsel's performance was constitutionally adequate as to this
complaint.  See Morales, 253 S.W.3d at 696-97 (quoting Goodspeed,
187 S.W.3d at 392).  Cueva has not shown otherwise, and the challenged conduct
is not "so outrageous that no competent attorney would have engaged in
it."  See Goodspeed, 187 S.W.3d at 392.

(v.)  Prosecutor's Arguments at Guilt-Innocence Stage

 

(a).  Tactic of Defense
Attorneys to Put Victim on Trial

 

Cueva complains that counsel should
have objected when the prosecutor argued during summation that he used to be a
defense lawyer and that "a standard tactic of defense attorneys, when your
victim has done something indefensible, [is to] put the victim on trial instead
and that's just what Mr. Cueva has tried to do."  Cueva asserts that
counsel's failure to object to this argument constituted deficient performance
and no sound strategy could justify this omission.

The court of criminal appeals has
condemned "final arguments that constitute uninvited and unsubstantiated
accusations of improper conduct directed at a defendant's attorney."  Gomez
v. State, 704 S.W.2d 770, 771 (Tex. Crim. App. 1985) (concluding that the
prosecutor's argument that a defense lawyer brought witnesses into court to
"manufacture evidence" to get his client "off the hook"
improperly struck at the defendant over the shoulders of counsel).  However,
the court of criminal appeals has noted a difference between improper remarks
which are directed at defense counsel himself and improper remarks which attack
or disparage counsel's argument or theory of defense.  See Coble v. State,
871 S.W.2d 192, 203-05 (Tex. Crim. App. 1993) (en banc) (approving the
prosecutor's argument concerning a saying among lawyers that if you have neither
the facts or the law on your side, "you argue something ridiculous");
Gorman v. State, 480 S.W.2d 188, 190 (Tex. Crim. App. 1974) (explaining
that the prosecutor's comment "[d]on't let him smoke-screen you, he has
smoke-screened you enough" was in response to defense counsel's argument
attempting to minimize the defendant's prior criminal record).

In this case, the prosecutor's argument,
aside from the irrelevant and inconsequential fact that the prosecutor used to
be a defense attorney, did not inject any new facts or speculation into the
argument that were not already before the jury.  After arguing that it is a
"standard tactic of defense attorneys, when your victim has done something
indefensible, [to] put the victim on trial," the prosecutor continued with
the following:  "He wants you to believe there's a grand conspiracy here. 
It involves this little girl, the police, the S.A.N.E. nurse, the little girl's
mother.  They all conspired to jack him up, unfairly, unjustly."

The argument was a summary of the
defense that Cueva presented, and it attacked the defense tactic and not the
defense attorney himself.  Moreover, whether Cueva's trial counsel labeled it a
"conspiracy" defense or not, Cueva's own testimony and the arguments
made by his counsel advanced the defensive theory that A.G.'s mother was
attempting to get rid of Cueva so that A.G.'s mother could then return to, and
be accepted by, her own family.  As in Coble and Gorman, the
prosecutor, in this case, was entitled to attack this theory as an attempt to
shift the blame to A.G.

(b).  "Sexual Release"

 

Cueva asserts that counsel's
performance was also deficient when he failed to object to the following
argument made by the prosecutor:

Also keep in mind that on this date in
question, [A.G.'s mother] and the defendant had not had sex.  He was looking to
this child for sexual release.  [A.G.'s mother] was tired.  She was exhausted that
day.  Presumably she was not going to stay up and have sex with him.  So who
did he turn to?  He turned to the daughter.

 

Cueva contends that no sound strategy
could justify this omission.

The four permissible areas of closing
argument include:  summation of the evidence; reasonable deduction from the
evidence; responses to argument of opposing counsel; and pleas for law
enforcement.  See Jackson v. State, 17 S.W.3d 664, 673-74 (Tex. Crim.
App. 2000); Alejandro v. State, 493 S.W.2d 230, 231-32 (Tex. Crim. App.
1973).  Relevant to this case, the court of criminal appeals has repeatedly
stated "that counsel may in argument draw from the facts in evidence all
inferences that are reasonable, fair, and legitimate and he will be afforded
latitude without limitation in this respect as long as his argument is
supported by evidence and offered in good faith."  Andujo v. State,
755 S.W.2d 138, 144 (Tex. Crim. App. 1988) (en banc).  And in making reasonable
deductions from the evidence, the trial court may properly ask the jury to
consider the circumstances surrounding the crime and what might have been on
the defendant's mind at the time.  See Hudson v. State, 675 S.W.2d 507,
511 (Tex. Crim. App. 1984) (en banc); Gonzales v. State, 831 S.W.2d 491,
494 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd).

In the present case, A.G.'s mother
admitted, in her trial testimony, that she took a short shower that evening
because she was "just exhausted."  In addition, Cueva testified that
A.G.'s mother also complained that her stomach hurt and that A.G. wanted her
mother to sleep with her that evening.  The prosecutor's argument that Cueva
then turned to A.G. for sex did not inject facts outside the record as now
urged by Cueva.  Rather, the argument asked the jury to consider the
circumstance that A.G.'s mother was tired and not feeling well and, as a
reasonable deduction, that she was probably unavailable and that Cueva might
have been motivated to seek sex instead from A.G.  Thus, we conclude the
argument in question was not so clearly outside the wide latitude given to the
prosecutor in closing argument that counsel was ineffective for failing to
object.

Accordingly, affording great
deference to counsel's ability, see Jaynes, 216 S.W.3d at 851, we
conclude that there was nothing to which counsel should have objected.  Counsel
did not perform "below an objective standard of reasonableness" in
this regard, and thus, counsel's decision not to object to the complained-of
prosecutorial arguments made during the guilt-innocence stage of trial was not
deficient.  See Ex parte Briggs, 187 S.W.3d at 466.

b.  Punishment Stage

(i.)  Testimony and Prosecutor's
Argument about Changes in the Law

 

Cueva claims that he was denied
effective assistance of counsel at the punishment stage when counsel did not
object to testimony provided by Probation Officer Kimberly Escamilla regarding
changes in the law.  Cueva asserts that because certain legislative amendments
had not taken effect at the time of the offenses, the challenged testimony was
irrelevant and improper.  See Tex.
R. Evid. 401, 402.  He also complains that counsel's performance was
deficient when he did not object to the prosecutor's summation of those
changes.

Specifically, Cueva asserts that
counsel should have objected when the prosecutor, during cross-examination,
elicited from Officer Escamilla that (1) the law regarding sex offenses changed
on September 1, 2007:  (2) subsequent to that change, a defendant convicted of
aggravated sexual assault of a child younger than age six faces a minimum
sentence of twenty-five years; (3) a defendant cannot receive probation from a
jury for sex offenses committed after that date; and (4) Cueva benefitted by
committing the offenses before the law changed.  See Acts 2007, 80th
Leg., ch. 593, ' 1.18 (changing
the minimum term of imprisonment from five to twenty-five years for the
aggravated sexual assault of a child younger than six years at the time of the
offense) (current version at Tex. Penal
Code Ann. ' 22.021(f)(1));
Acts 2007, 80th Leg., ch. 593, ' 1.06 (eliminating
the possibility of probation for the conviction of indecency with a child,
aggravated sexual assault of a child, or sexual assault, and the victim of the
offense is younger than fourteen years when the offense is committed) (current
version at Tex. Code Crim. Proc. Ann. art.
42.12, ' 4(d)(5)); see
also Acts 2007, 80th Leg., ch. 593, '
4.01(a) (explaining that
the change in law made by this Act applies only to an offense committed on or
after September 1, 2007, and an offense committed before September 1, 2007, is
covered by the law in effect when the offense was committed).  In addition, Cueva
contends defense counsel should have objected when the prosecutor argued that
the jury needed to do the right thing, which was to assess "life in
prison" "because the minimum sentence for one count of aggravated
[sexual assault] of a child is now 25 years prison," and the Legislature
has changed the law and decided that "someone who would rape a
six[-]year[-]old child should no longer receive probation … [b]ecause
pedophiles are dangerous."

Our review of the record shows that
the State cross-examined Probation Officer Escamilla about a change in the law
that became effective shortly after the date of the aggravated sexual assault
in question, a change which would have increased the punishment for this
offense from a five-year minimum to a twenty-five-year minimum and eliminated
the possibility of probation for these offenses.  Cueva's counsel did not
object to this testimony.  In addition, during her summation, the prosecutor
commented on this fact, without objection.

In a non-capital felony trial,
evidence is admissible during the punishment stage if "the court deems
[it] relevant to sentencing."  Tex.
Code Crim. Proc. Ann. art. 37.07, ' 3(a)(1).  The
court of criminal appeals recently addressed the relevance of punishment
evidence as follows:

The Legislature did not define the
term "relevant" in the Code of Criminal Procedure, and beyond the few
items enumerated in Article 37.07, it has not given any guidance as to what
evidence is relevant to punishment.  Borrowing from the definition of
"relevant" in Texas Rule of Evidence 401 is of little avail because
the factfinder's role during the guilt phase is different from its role during
the punishment phase.  Unlike the guilt phase, where the factfinder must decide
discrete factual issues, deciding what punishment to impose is a
"normative process, not intrinsically factbound."  Thus, what is
"relevant" to assessing punishment is "a function of policy
rather than relevancy."  Evidence is relevant if it helps the factfinder
decide what sentence is appropriate for a particular defendant given the facts
of the case.

 

Hayden v. State, 296 S.W.3d 549,
552 (Tex. Crim. App. 2009) (citations omitted).

It is clear that punishment against
Cueva was to be assessed under the range of punishment for the offenses at the
time they were committed, prior to September 1, 2007.  However, because what is
"relevant" to assessing punishment is a "function of policy rather
than relevancy" and deciding what punishment to impose is a
"normative process, not intrinsically factbound," evidence involving
subsequent changes in the law is arguably relevant to help the jury decide what
sentence is appropriate for a particular defendant given the facts of the case,
even though the exact the range of punishment is provided for by the applicable
law.  Hayden, 296 S.W.3d at 552.  Importantly, Cueva provides no
authority that suggests this evidence is so clearly irrelevant and improper
that trial counsel may be held ineffective for failing to object to its
admission or to the prosecutor's argument that includes that information, and
we find none.  Where there is no statute or case law that suggests this
evidence is inadmissible, the law is unsettled, and we cannot conclude that
trial counsel was ineffective for failing to object at trial.  See Ex parte
Varelas, 45 S.W.3d 627, 637 (Tex. Crim. App. 2001) (en banc); see also
Ex parte Roemer, 215 S.W.3d 887, 894 (Tex. Crim. App. 2007); Ex parte
Chandler, 182 S.W.3d 350, 359 (Tex. Crim. App. 2005).

In addition, proper jury argument
includes, among other things, a plea for law enforcement and a summation of the
evidence presented at trial.  Alejandro, 493 S.W.2d at 231-32; Jackson,
17 S.W.3d at 673-74.  Based on our review of the record, including the context
in which the prosecutor made this argument, it would have been reasonable for
counsel to interpret the summation as a plea for law enforcement or as a
summation of the evidence.  See Alejandro, 493 S.W.2d at 231-32; Jackson,
17 S.W.3d at 673-74.  Therefore, in this regard as well, we would not conclude
that counsel's performance was deficient.

(ii.)  Testimony Requesting that Cueva Receive a Life
Sentence

 

Cueva asserts that because counsel
elicited and failed to object to requests from prosecution witnesses that Cueva
receive a life sentence, his performance was deficient.  Cueva argues that no
sound strategy justifies counsel’s conduct.

Counsel elicited from A.G’s
grandmother that she wanted Cueva to pay for what he did to her granddaughter
by spending the rest of his life in prison and that she would not be happy
unless he received a life sentence.  Counsel then elicited an affirmative
response when he asked if the witness was “not going to be happy unless he
spends the rest of his life in prison.”  Later the prosecutor elicited from
A.G.’s great-grandmother that justice would be the maximum penalty.  Counsel
did not object to this testimony.  Other testimony at the punishment phase brought
out that A.G.’s family did not like or approve of Cueva, even before the
incidents for which he was convicted occurred.  During his argument, Cueva's
counsel then suggested that these witnesses were not seeking justice, but
vengeance, in contrast to A.G. herself, who counsel claimed "did not come
up here and tell you to throw Charles Cueva away for the rest of his life. 
Because the child can see the good, the redeemable in us."

The record supports a conclusion that
it was sound trial strategy to show the bias of the prosecution witnesses in
order to demonstrate that their requested punishment was unreasonable and in
sharp contrast to what the defense believed would be a just outcome—that being
to place Cueva on probation.  Counsel made strategic decisions regarding this
testimony, and decisions based in strategy do not constitute deficient
performance.  See Strickland, 466 U.S. at 689.  Cueva has not shown, in
the record, that counsel's conduct was not the product of a strategic decision,
and we cannot conclude that counsel’s conduct, in this regard, was so
outrageous that no competent counsel would have engaged in it.  See Morales,
253 S.W.3d at 696-97.

(iii.)  Opinion Testimony that
Sex Offenders Cannot be Rehabilitated

 

Cueva contends that counsel's failure
to object to the Probation Officer Escamilla’s opinion that sex offenders
cannot be rehabilitated constituted deficient performance and that no sound
strategy would justify this omission.[20]  Cueva also
complains that counsel’s performance was deficient because he did not object to
the State's alleged failure to qualify Officer Escamilla. 

On direct examination, defense
counsel established, through Officer Escamilla's testimony, that “some sex
offenders who are on probation do complete the probation" and that
"[s]ome don’t”; that there are “people though who end up not violating the
probation, satisfactorily completing the probation, and being discharged from
the program.”  On cross-examination, after testifying that she was not familiar
with the rate of recidivism or rehabilitation of sex offenders, Officer
Escamilla agreed with the State that she was aware that sex offenders cannot be
rehabilitated and because they cannot be rehabilitated, the most a probation
officer can do is try to get them to change their behavior.  However, Officer
Escamilla later testified on cross-examination that she was not familiar with a
sex offender’s compulsion to offend.  And later on re-direct, when defense
counsel asked Officer Escamilla whether Cueva’s admission to some of the
charges indicated that he was likely to be a good candidate for probation,
Officer Escamilla testified that "if he did confess to some of the
offenses then I would say, yes, that he is … seeking treatment," and if he
did request help for what he had done to A.G., she agreed that such a desire
played a big part in determining whether he would be a successful candidate for
probation.  Counsel was also able to overcome the State's objection that the
witness had not been qualified to provide such testimony in response to
counsel's question because the trial court determined the State had already
gone into this area of questioning.

A trial court may admit expert
testimony if "scientific, technical, or other specialized knowledge will
assist the trier of fact to understand the evidence or to determine a fact in
issue."  Tex. R. Evid. 702. 
For an expert's opinion to be admissible, the proponent must establish that the
expert is qualified to render the opinion and that the testimony is relevant and
based on a reliable foundation.  Acevedo v. State, 255 S.W.3d 162, 168
(Tex. App.—San Antonio 2008, pet. ref'd).  A probation officer may give an
opinion on a defendant’s suitability for probation, either as a lay opinion
under rule of evidence 701 or as an expert opinion under rule 702, based on her
personal knowledge of the defendant.  Ellison v. State, 201 S.W.3d 714,
722-23 (Tex. Crim. App. 2005); see Tex.
R. Evid. 701 & 702.  Defense counsel is not required to challenge
the qualifications of every expert who testifies at trial.  Easley v. State,
978 S.W.2d 244, 251 (Tex. App.—Texarkana 1998, pet. ref’d).  This is true
especially when the State could easily have demonstrated the expert’s
qualifications if called upon to do so and an objection would only have wasted
the court’s time or antagonized the jury.  Id.

Although it appears from the record
that Officer Escamilla’s qualifications were established or at least conceded, even
if they were not, we cannot conclude that counsel was required to challenge her
qualifications.  See id.  The record is silent regarding whether the
State could easily have proven Officer Escamilla’s qualifications if they had
been challenged at trial and an objection would have wasted the trial court’s
time or antagonized the jury.  See id.  Therefore, we cannot conclude
that trial counsel’s performance was deficient when he did not object that the
State did not establish Officer Escamilla's qualifications.  See Acevedo,
255 S.W.3d at 168.

Regarding the admission of
rehabilitation testimony, Cueva relies on DeLeon v. State.  322 S.W.3d
375, 378, 384-87 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).  The DeLeon
Court affirmed DeLeon’s conviction but found that his counsel was ineffective
during the punishment stage for presenting a probation officer as a witness and
failing to object to the State’s line of questions that resulted in “highly
inflammatory testimony”.  Id. at 385-86.  Cueva claims that DeLeon
is instructive because his case is indistinguishable.  We disagree.

During the punishment hearing, DeLeon’s
counsel called a probation officer who testified about counseling and treatment
that sex offenders receive when they are placed on probation; through this
education-type process, they learn to control their behavior and to remove
themselves from high-risk situations.  Id. at 385.  On cross-examination
by the State, the probation officer testified as follows:

Q.        If in a particular case the facts were to show that what
a person was convicted for was a situation where either through opportunity or
through planning it was in a position where nobody else would see it, it was
secretive; unless a child talked nobody would know.  Is that risk still there
if the people around aren’t trying to prevent that?

 

A.        Sure.  That risk will always be there.  The risk will
never disappear.  Regardless if they get alone with the child, regardless if
there are other adults in the house, the risk remains.  [P] The risk is in the
brain.  It’s up here.  It’s the desire.  You can put a person in prison, you
can do anything you want to them.  You cannot get rid of the deviancy, the
sexual desire, in any offender.  [P] Sexual behavior is natural, but when it
becomes deviant, that is when we get worries.  Once it is with them, it doesn’t
disappear.  That is the purpose of treatment.  [P] Punishment—I don’t care what
kind of punishment you give somebody, it never forces the issues out of their
brain.  They will always have some kind of deviant sexual desire, and they will
always be at risk to the community.  That is just the way it works.

 

Id. at 384-85.  On
re-cross, the probation officer expanded his testimony with the following:

Q.        Now rehabilitation of sex offenders:  Are they ever
rehabilitated to the point where the risk is gone?

 

A.        No. Absolutely not.  The risk will always be there.  It
may be minimized or lessened, but the risk will always remain because we don’t
know what anybody here is thinking.  We can never assume that we know what a
sex offender is thinking.  [P] The risk is this:  they were sex offenders
before they committed the offense.  So we don’t know what he is thinking, what
they’re planning.  We can give them treatment, we can do all the things that
are required by law; but we can’t see up here, so we can never truly predict
what is going to happen from day one to day two.  [P] You have got to assume
all the risk because you have heard story after story, “I never thought he
would do this; I never thought my grandfather would do this; I never thought my
dad would do this.”  [P] So you never, ever push out the risk.  You always
assume the risk is great, then hopefully that is going to create enough
protection to prevent other children from being impacted one way or the other. 
You just don’t know.  [P] I can have guys that do everything perfectly, but up
here they’re still having sexual fantasies of molesting two-year-old girls or
two-year-old boys.  Just because you succeed well in probation does not remove
the risk.

 

Id. at 385.  The
probation officer then listed various problems he had encountered as a
probation officer dealing with sex offenders and concluded by testifying that
“[i]f you want to protect the public, then you put them in a situation where
they can’t have access to children.”  Id.

Based on the above testimony, the DeLeon
Court concluded that, even without determining whether the officer was
qualified to give expert opinion testimony such that the testimony on these
matters was admissible on that basis, the “testimony was particularly damaging
to appellant’s prospects for probation or a short prison sentence” and that
“trial counsel was deficient in failing to object to the highly inflammatory
testimony and for calling [the officer] to the stand in the first place”
because he “should have known how [the officer] was going to testify on these
matters.”  Id. at 385-86.  Finally, the Fourteenth Court of Appeals determined
that “[t]here could have been no strategic reason for producing and permitting
such damning testimony.”  Id. at 386.

The Deleon Court's reversal was
not based on the fact that counsel failed to object to the probation officer’s
qualification to render an opinion, but rather on the highly inflammatory
nature of the officer’s testimony as a whole.  Id. at 385-86.  Thus, it
provides no support for Cueva’s qualification argument.  Cueva does not
complain that counsel’s performance was deficient for calling Officer Escamilla
to the stand, as did the appellant in DeLeon.  See id.  Instead,
he contends only that counsel was deficient in failing to object to testimony
regarding rehabilitation.

As to Officer Escamilla’s rehabilitation
testimony, while she agreed that sex offenders cannot be rehabilitated, she
also agreed that one can try to get a sex offender to change his behavior,
which would support a conclusion that the risk may be minimized or lessoned. 
Additionally, Officer Escamilla testified, somewhat inconsistently during her
second cross-examination, that she was not familiar with a sex offender’s
compulsion to offend.  We cannot conclude that this testimony is “highly
inflammatory” and “damning” testimony.  See id. at 384-85.  It falls far
short of the testimony condemned by the DeLeon Court, and DeLeon
is therefore also distinguishable for that reason.  See id.

Finally, by allowing the State’s line
of questioning, counsel was later able to ask Officer Escamilla whether Cueva’s
admission to some of the charges indicated that he was likely to be a good
candidate for probation.  The trial court overruled the State's objection to
this line of questioning on the basis that the State had already gone into this
area.  Therefore, unlike DeLeon, Cueva has not shown in the record that
counsel's conduct was not the product of a strategic decision.  See id.
at 386.  Because we cannot conclude that counsel’s conduct, in this regard, was
so outrageous that no competent counsel would have engaged in it, we must,
therefore, presume that his performance was constitutionally adequate.  See
Morales, 253 S.W.3d at 696-97.

(iv.)  Testimony that Cueva Committed Extraneous
Offenses

 

Cueva asserts that counsel’s conduct
in eliciting, opening the door to, and failing to object to certain
inadmissible extraneous offenses based on hearsay constituted deficient
performance.  He claims that no sound strategy could justify this conduct.

In support of his argument, Cueva
relies on Ex parte Walker.  777 S.W.2d 427, 432 (Tex. Crim. App. 1989)
(en banc).  The court of criminal appeals in Ex parte Walker held that
counsel was deficient for allowing in and discussing Walker's adjudicated
extraneous offense during the punishment stage.  Id.  Ex parte Walker
was decided under the former statute, which generally did not permit extraneous
offenses to be admitted.  Id.  The law has since changed, and unadjudicated
extraneous offenses are now admissible during punishment if the State proves
them beyond a reasonable doubt.  Tex.
Code Crim. Proc. Ann. art. 37.07, § 3(a); see Mitchell v. State,
931 S.W.2d 950, 954 (Tex. Crim. App. 1996) (en banc).

Nonetheless, Cueva objects to certain
references to a prior assault against A.G.’s mother and to Cueva’s prior
driving while intoxicated (DWI) arrests.  Reference to the prior assault
occurred during the punishment stage when, during cross-examination of A.G.’s
grandmother, Cueva’s counsel appeared to be developing the reasons for, and the
extent of, her disapproval of Cueva, including the fact that she had called the
police and gotten him arrested.  On cross-examination of A.G.’s great aunt,
Cueva’s counsel also developed her dislike for Cueva and how she was angry that
all charges against Cueva for the prior assault had been dropped.

During direct examination of defense
witness Adan Barrera, Cueva’s counsel allowed the witness to detail what he
knew about Cueva.  Barrera stated, among other things, that Cueva was “a good
father,” “a great person,” and agreed that he was “a responsible person.”  On
cross-examination, the State then asked whether Cueva was a good father and a
responsible person when he beat his girlfriend in front of his daughter and got
arrested twice in one year for DWI.  Finally, during direct examination of
Cueva’s father, counsel asked what kind of person Cueva was and whether he
could follow the rules and conditions of probation, and his father answered
that Cueva was “a great man, good man.”  On cross-examination, the State
elicited testimony from Cueva’s father that he knew about Cueva’s DWI arrests
but not about his arrest for beating A.G.’s mother.

The record
supports a conclusion that it was sound trial strategy to show the
grandmother’s and great-aunt’s dislikes for, and biases against, Cueva to
demonstrate that their requested punishment was unreasonable.  Counsel also
took a strategic risk in asking about the kind of person Cueva was, perhaps
seeking sympathy for Cueva.  By doing so, counsel had no basis to object to the
State’s impeachment of those witnesses with prior bad conduct.  Thus, we
conclude counsel made strategic decisions regarding this testimony.  Strickland,
466 U.S. at 689.  Again, Cueva has not shown, through the record, that
counsel's conduct was not the product of a strategic decision, and we cannot
conclude that counsel’s conduct, in this regard, was so outrageous that no
competent counsel would have engaged in it.  See Morales, 253 S.W.3d at
696-97.

We also note that
the punishment charge contained a paragraph instructing the jury not to
consider testimony concerning extraneous offenses if it was not proved beyond a
reasonable doubt.  Therefore, counsel’s performance was not ineffective for
this reason.

(v.)  Prosecutor's Punishment-Stage Arguments

 

(a).  Cueva “Attacked” A.G.

 

Cueva complains that counsel’s
failure to object to the following portion of the prosecutor’s closing argument
on punishment was deficient, not strategic:

All we know is that he touched his
penis on her anus and on her vaginal area, and even after he had done all of
that, when he was caught in the act, he basically turned the tables on her and
ended up during this trial victimizing her again by attacking her.

 

Cueva claims that, by this argument,
the prosecutor was arguing that Cueva victimized A.G. by going to trial and
making her testify, an argument he contends is improper and should have
required a mistrial.  See, e.g., Villarreal v. State, 860 S.W.2d 647,
650 (Tex. App.—Waco 1993, no pet.) (concluding that the prosecutor’s argument
equating the fulfillment of the constitutional right to a jury trial by requiring
a complainant to testify about the defendant raping the child complainant again
by going to trial was extreme and so manifestly improper and harmful that no
instruction to disregard could reasonably remove it from the minds of the
jurors).  The prosecutor, however, did not say that Cueva victimized A.G. by
making her go to trial and testify against him, as Cueva asserts.  Rather, the
prosecutor argued that Cueva “ended up during this trial victimizing [A.G.]
again by attacking her.”  She did not explain or expand upon her statement.

Moreover, Cueva concedes, on appeal, that
the prosecutor was arguing that Cueva attacked A.G.’s credibility.[21]  And Cueva,
himself, testified that A.G. was lazy in the mornings, made excuses to get out
of going to school, and got rashes because she did not know how to clean
herself properly.  Such testimony could be seen as an embarrassing and
demeaning attack on A.G.  Cueva also testified that A.G.’s mother “went all
psycho on me, saying all kind of retarded stuff” and that “I know what kind of
person she is.”  The prosecutor could have been referring to this testimony
when arguing that Cueva victimized A.G. again by attacking her during the
trial.

Cueva provides us with no record
citations to support his characterization of the prosecutor’s argument.  And he
has not referred this Court to any controlling authority to show that an
objection would have been sustained or, if overruled, would have constituted
reversible error, and we find no such authority.  See Miniel v. State,
831 S.W.2d 310, 324 (Tex. Crim. App. 1992) ("While the prosecutor's
misstatement of the evidence regarding fingerprints on the shock absorber was
improper and would have been subject to an objection, even had such been
erroneously overruled such error would certainly not have been reversible.");
see also Holland v. State, 761 S.W.2d 307, 319 (Tex. Crim. App. 1988)
("[T]rial counsel was under no obligation to do what would amount to a
futile act.").

Therefore, affording great deference
to counsel's ability, see Jaynes, 216 S.W.3d at 851, we conclude
that there was nothing to which counsel should have objected.  Counsel did not
perform "below an objective standard of reasonableness" in this
regard, and thus, counsel's decision not to object to this argument was not
deficient in this instance.  See Ex parte Briggs, 187 S.W.3d at 466.

(b).  Life Sentences and Another
Trial

 

Cueva asserts that the prosecutor's
closing arguments that A.G. and the police officers wanted a particular
punishment and that there was a pending charge in Mission, Texas, involving
A.G., which could result in another trial depending on the punishment assessed
in this trial, were improper and should have been objected to by counsel. 
Cueva contends that these arguments were improper because there was no evidence
in the record to support such a summary, and the summary was not a reasonable
deduction from the evidence.  See Dorsey v. State, 709 S.W.2d 207, 210
(Tex. Crim. App. 1986) (en banc) ("[I]f a prosecutor wants to argue that a
victim desires his or her assailant incarcerated, then these facts need to be
in evidence."); see also Alejandro, 493 S.W.2d at 231-32
(setting out four areas of a proper jury argument); Jackson, 17 S.W.3d
at 673-74 (same).

Specific to this complaint, the
prosecutor argued the following:

The community has no choice with your
decision.  Whatever you decide, Robstown[, Texas] is stuck with.  I find it
interesting that the defense is arguing that [A.G.] does not want [Cueva] to go
to prison.  That's not true.  [A.G.] wants [Cueva] in prison for the rest of
his life.  So does her family.  The detective–-the detectives in this community
is [sic] asking for a life sentence.

 

….

 

Now it is your turn to affirm [A.G.] 
What would be affirmation here for this horrible brutal crime is 99 years [in]
prison.  At least give [A.G.] the comfort of knowing that [Cueva] will never
ever get out of prison.  By giving [Cueva] a high sentence, [A.G.] will not
have to go through another trial in Mission, Texas.  This will be it.

 

Based on our review of the record,
including the prosecutor's entire closing argument, it would have been
reasonable for counsel to interpret the prosecutor's argument as a plea for law
enforcement rather than a summary of the testimony of the witness.  See Jackson,
17 S.W.3d at 673-74.  Moreover, even were we to agree with Cueva's
interpretation that the prosecutor was arguing that everyone wanted Cueva in
prison for life, this is consistent with Cueva's trial strategy to show that
the prosecution witnesses were biased against him, a strategic reason for not
objecting.  See Strickland, 466 U.S. at 689 (providing that decisions
based in strategy do not constitute deficient performance).  And to the extent
we would conclude that counsel's failure to object was improper, we would
further conclude that it did not fall below an objective standard of
reasonableness under the prevailing professional norms.  See Ex parte Briggs,
187 S.W.3d at 466.

As for the prosecutor's argument that
A.G. would have to endure another trial in Mission, Texas, if the jury did not
assess a long sentence, counsel may have decided not to object in order to
avoid highlighting such an argument or encouraging the jury to dwell on the
possibility of another trial.  See Garcia, 887 S.W.2d at 881.  He may
also have decided that the jury's speculation that, whatever sentence they
imposed, Cueva might still be subject to prosecution and punishment in a
separate case, which would work in his favor.

Thus, we conclude counsel made
strategic decisions regarding the prosecutor's argument.  Cueva has not shown that
counsel's conduct was not the product of a strategic decision, and we cannot
conclude that counsel’s conduct, in this regard, was so outrageous that no
competent counsel would have engaged in it.  See Morales, 253 S.W.3d at
696-97.

(vi.)  Counsel's Argument that
It Was Not His Job to Seek Justice

 

Cueva asserts that it was unsound for
his counsel to execute a purported strategy by arguing as part of his
punishment summation that it was not his job to see that justice was done. 
Cueva contends that this argument is inconsistent with any reasoned punishment
strategy, and therefore, counsel's conduct was objectively deficient.[22]

Counsel presented the following
summation at the close of the punishment stage:

I want you to think beyond just the
argument the prosecution is going to make when they talk about justice.  In the
[c]ode of [c]riminal [p]rocedure, the prosecutor's job is to see that justice
is done.  That's not my job.  My job is to make the best plea for my client
that I can possibly do.  That is what I am doing to you here today.  Without
shame, without embarrassment of any kind whatsoever, I am here pleading for the
life of my client, Charles Anthony Cueva.

 

In this closing argument, counsel
referred to the prosecutor's job—one of seeking justice–-and to his job–-one of
pleading for his client.  It is reasonable to conclude that counsel was
explaining each counsel's respective function at trial, emphasizing that
defense counsel does not have a generalized duty to seek justice, as does the
prosecutor.  Rather, defense counsel is to make the best case he can for his
client, which would include arguing the evidence to support an acquittal or a
light punishment.  It is also reasonable strategy for the defense counsel to
talk with the jury about his role in order to build credibility, to avoid the
appearance that he is trying mislead or behave unethically, and to be candid
about his client's shortcomings.  See Martin v. State, 265 S.W.3d 435,
446 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (quoting Yarborough v.
Gentry, 540 U.S. 1, 9 (2003) ("By candidly acknowledging his client's
shortcomings, counsel might have built credibility with the jury and persuaded
it to focus on the relevant issues in the case.")).

Thus, we conclude counsel made
strategic decisions regarding this argument.  Cueva has not shown, in the
record, that counsel's conduct was not the product of a strategic decision, and
we cannot conclude that counsel’s conduct, in this regard, was so outrageous
that no competent counsel would have engaged in it.[23]  See Morales,
253 S.W.3d at 696-97.

3.  Summary

Accordingly, having concluded that
the trial court did not abuse its discretion in denying
ineffective-assistance-of-counsel challenges made by Cueva in his motion for
new trial, we overrule Cueva's third and fourth issues as to those claims.  We
also overrule the third and fourth issues as to Cueva's additional claims
because we have concluded that counsel's performance as to each of the
additional claims was not ineffective under Strickland.

IV.  Conclusion

We affirm the judgment of the
trial court.

 

                                                                                                 NELDA
V. RODRIGUEZ

                                                                                                Justice

 

Publish.

Tex.
R. App. P. 47.2(b).

 

Delivered and filed the 

2nd day of May, 2011.         









[1]
Cueva was indicted for indecency with a child under an earlier version of section
21.11(a).  In 2009, amendments were made to this section removing from
subsection (a) the words "and not the person's spouse" and adding the
words "of age" in their place.  See Act of May 18, 2009, 81st
Leg., R.S., ch. 260, '
1, 2009 Tex. Gen. Laws 710
(current version at Tex. Penal Code Ann.
' 21.11(a) (West Supp.
2010)).  Because the relevant portions of the prior and current statutes do not
differ materially, we will refer to the current version of this section
throughout this opinion.





[2] The jury acquitted
Cueva on two counts of aggravated sexual assault and could not reach a verdict
on the remaining two counts.  The trial court declared a mistrial on those
counts, and the State dismissed them.

 





[3]
The earlier version of section 22.021(e) also applies in this case.  When
amended in 2007, no changes were made to subsection (e), which identifies the
offense as a first degree felony.  See Acts 2007, 80th Leg., ch. 593, ' 1.18, eff. Sept. 1, 2007
(current version at Tex. Penal Code Ann.
' 22.021(e) (West
Supp. 2010)).  Therefore, throughout the opinion, we will refer to the current
version of this provision.  However, subsection (f), which provides that
"[t]he minimum term of imprisonment for an offense [of the first degree]
under this section is increased to 25 years if … the victim is younger than six
years of age at the time of the offense is committed," was also added as
part of the 2007 amendment.  See id.  Although subsection (f) did not
take effect until September 1, 2007 and does not apply in this case, we note
this change because, as part of his ineffective assistance of counsel issue,
Cueva complains that his counsel should have challenged the State's
punishment-stage argument that the Legislature changed the
law after Cueva committed the offenses to eliminate probation and increase the
minimum sentence to twenty-five years and that Cueva benefited by committing
the offenses before the law changed.  In addition, earlier versions of
sections of 12.32 and 12.33 apply, but because the relevant portions of the
prior and current law do not differ materially, we will refer to the current
version of these sections throughout this opinion.  See Acts 2009, 81st
Leg., ch. 87 (current version at Tex.
Penal Code Ann. ''
12.32, 12.33 (West Supp. 2010) (amending each section to remove from subsection
(a) the words "institutional division" and adding the words
"Texas Department of Criminal Justice" in their place).





[4] The defense rested
on May 15, 2009.  On May 21, 2009, after Dr. Kutnick's affidavit was formally
admitted, without objection, the State rested, and each side presented closing
argument.





[5] While Cueva
challenges most findings, he does not argue that the findings should not be
considered because they were untimely made by the trial court.





[6] 
Although Cueva filed his notice of appeal on April 7, 2009, almost three months
before the court's findings were filed on July 1, 2009, he did not file his
brief until February 8, 2010.  Cueva does not argue that the filing of the
findings more than 100 days after sentence was imposed harmed him, i.e.,
that he was denied the opportunity to properly present his appeal.  Rather, on
appeal, Cueva had the opportunity to, and did, attack most of the trial court's
findings.

 





[7] In
Strickland v. Washington, the Supreme Court identified the ABA Standards
for Criminal Justice as one guide to determine what is reasonably expected of
defense counsel.  See 466 U.S. 668, 688 (1984).  Under the section
titled "Prompt Action to Protect the Accused," those standards
encourage counsel to consider numerous means to protect the client, including
"obtaining psychiatric examination of the accused when a need appears."  ABA Standards for Criminal Justice 4-3.6 (3rd
Ed. 1993) (emphasis added).





[8]  The Texas Court of
Criminal Appeals noted that the El Paso Court of Appeals had found eight
instances of deficient performance by trial counsel.  Craig v. State,
825 S.W.2d 128, 129 (Tex. Crim. App. 1992 (en banc).  The "immediate
impression [of the court of criminal appeals] was that these deficiencies would
necessitate reversal" of the entire case.  Id.  However, upon
closer analysis, the court determined that Craig had not satisfied the
prejudice prong of Strickland.  Id. (citing Boyd v. State,
811 S.W.2d 105, 109 (Tex. Crim. App. 1991) (en banc)) (providing that the Strickland
test is the proper standard to gauge counsel's effectiveness at the
guilt-innocence phase of a non-capital trial and at the guilt-innocence and
punishment phases of a capital murder trial).

 





[9] 
The Craig Court also found, in its original opinion, that this incident
was not "attributable to colorable tactical decision."  See id.
at 435 (citing Craig, 783 S.W.2d at 626).  Again, this
distinguishes Craig because the findings of the trial court in this
case, as set out below, suggest a strategic or tactical decision-making on the
part of counsel regarding the use of "victim."





[10]
In his motion for new trial, Cueva also complained that his
trial counsel failed "to object to the prosecutor's argument that [Cueva]
and his mother were lying" during the guilt-innocence stage of the trial. 
However, no findings were made regarding this claim, and Cueva does not make
this argument on appeal.

 





[11] Ramos explained that
he was told "[t]here was a five-year old victim and that the accused was
discovered by the mother."  He was not told what specifically was
discovered, and he had not talked with A.G. or her mother.  Ramos testified
that he was "not forming an opinion about the guilt or innocence about
this—this case.  [He was] merely providing [his] experience about … the
validity of—of abuse victims and the behaviors of perpetrators that [he knew]
from [his] experience."





[12] Cueva recognizes
that the State gave pre-trial notice that it intended to introduce outcry
statements made by A.G. through testimony from her mother, McLaughlin, and
Ricardo Jiminez, a counselor.  Cueva's trial counsel successfully objected to
Jiminez testifying about statements made by A.G. on the basis that he was not a
proper outcry witness.  Therefore, we have nothing to review regarding Jiminez's
testimony.

 

In addition to complaining about testimony related to the
alleged threats and the reason for A.G.'s silence, Cueva complains, for the
first time on appeal, about counsel's failure to object to additional inadmissible
hearsay testimony provided by A.G.'s mother and McLaughlin.  Therefore, these
additional complaints should be addressed under the Strickland standard. 
However, because the record is insufficiently developed to support this
complaint of ineffective assistance, we need not address it further.  See
Rylander v. State, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003).

 





[13] McLaughlin described
the "female sexual organ" as including the labia, the vagina, where
the hymen is located, and the cervix.

 





[14] Cueva
also complains that counsel's performance was deficient when he allegedly
opened the door to, elicited, and failed to object to testimony provided by
A.G. that Cueva kicked and pushed her mother.  These allegations were not
raised in Cueva's motion for new trial and will, therefore, be addressed later
in this opinion.





[15] Cueva testified that
he told Detective Gonzalez that he did not do anything to A.G., that A.G.'s
grandmother did not like him and was mad when Cueva, A.G.'s mother, and A.G.
moved to Robstown, and that A.G.'s mother fabricated her story about what she
saw in the bedroom.  Cueva presented a fabrication defense and argued that A.G.
was improperly influenced.





[16] At the motion for
new trial hearing the parties agreed and the trial court acknowledged that
although the motion referred to Count 6, it should be correctly referred to as
Count 4, and we will do likewise.

 





[17] We
overruled Cueva's second issue, concluding that although the trial court
erred when it included "plus any good conduct time earned" in the
third paragraph of its parole instruction, there was no egregious harm.  See
Ngo v. State, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005) (explaining
that when no objection is made to what is determined to be charge error, we may
reverse only if the record shows egregious harm).

 





[18] Gonzalez testified
that Cueva told him that he did not know why he "did it," but that it
was probably because he had been molested as a child.  Gonzalez stated that
Cueva told him that he was sorry for what he did; he did not penetrate A.G.; he
touched her more than ten times over a three-year period; he touched her
"butt," got aroused, and kissed her lips; and he once let her touch
his penis.  Similar statements are found in Cueva's written statement.





[19]
By this issue, Cueva also contends that counsel did not request, and the State
did not provide, notice of extraneous offenses and acts of misconduct that it
intended to offer.  He states in a conclusory fashion that counsel's failure to
request such notice was ineffective assistance.  Cueva also summarily asserts
that counsel’s performance was deficient because he opened the door to and elicited
this testimony from A.G.  He cites no specific supporting authority, however,
and provides no explanatory argument for these contentions.  In
accordance with rule 38.1(i) of the Texas Rules of Appellate Procedure, we will
only consider contentions that are supported by clear and concise arguments
with appropriate citations to authorities and to the record.  Tex. R. App. P. 38.1(i).  Because these
assertions are inadequately briefed, we will not consider them.





[20] Cueva
also generally contends that counsel's performance was deficient because he
failed to object to the prosecutor's closing argument that sex offenders
"are not ever rehabilitated."  However, Cueva cites no specific
supporting authority and provides no explanatory argument for this contention. 
We will not consider this portion of Cueva's argument because it is
inadequately briefed.  See id.





[21] In
his appellate brief, Cueva comments that “[t]here is no evidence in the record
that [Cueva] physically attacked [A.G.] during the trial,” rather “the
prosecutor meant that [Cueva] challenged [A.G.’s] credibility.”





[22]
Again, Cueva relies on Craig v. State, this time in support of
his general conclusion that counsel's conduct was objectively deficient.  See
847 S.W.2d at 436.  As noted earlier, however, the Craig
Court considered the effect of counsel's alleged errors at the punishment stage
by applying the then-accepted Duffy standard of review, not the Strickland
standard.  See id. at 435 (citing Ex parte Duffy, 607 S.W.2d 507,
514 n.14 (Tex. Crim. App. 1980)); see also Strickland, 466 U.S. at 689;
Ex parte Walker, 777 S.W.2d 427, 430 (Tex. Crim. App. 1989).  Therefore, we
do not agree that Craig supports Cueva's argument for reversal in this
case.





[23]
Cueva also complains that the alleged errors collectively prejudiced his
defense.  Having concluded that Cueva did not satisfy Strickland’s
deficiency prong by a preponderance of the evidence as to each alleged individual
error or having concluded that, if his performance was deficient, there was no
prejudice shown, we need not address Cueva's "collective prejudice"
argument.  See Perez v. State, 310 S.W.3d 890, 893 (Tex. Crim.
App. 2010) (providing that a defendant must satisfy both of Strickland's
prongs by a preponderance of the evidence); Goodspeed v. State,
187 S.W.3d 390, 392 (Tex. Crim. App. 2005); see also Strickland, 466
U.S. at 687; see also Tex. R.
App. P. 47.1.